Leonard CAMPBELL et al., Plaintiffs,

v.

Anderson McGRUDER et al., Defendants.

Civ. A. No. 1462–71.

United States District Court, District of Columbia.

Nov. 5, 1975.

See also, D.C., 416 F.Supp. 100.

J. Patrick Hickey, Public Defender Service, Washington, D. C., for plaintiffs.

Thomas R. Nedrich, Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM OPINION

BRYANT, District Judge.

Pursuant to the directions of our Circuit Court of Appeals as contained in its remand order, this Court has held hearings pointed to determining the degree to which compliance has been had with its interim order of March 21, 1975 relative to the housing of pretrial detainees at the District of Columbia Jail. Also pursuant to the order, the defendants are directed to take specific steps which appear to be feasible, and likely to solve the problem of space. The results of these proceedings and the supplemental directions to the defendants are as follows:

Following issuance of the Order by the United States Court of Appeals on May 2, 1975, the District of Columbia Department of Corrections filed with this Court on May 16, 1975, a report indicating that it was then in compliance with the requirement of this Court's Interim Order of March 21, 1975, that no member of plaintiff class be housed in an area less than 48 square feet at the District of Columbia Jail. Compliance with this Order was achieved notwithstanding earlier testimony by Mr. Jackson, the Director of the Department, on April 1, 1975, that the Department had "reached the ultimate" in its efforts to comply with the Order, and the arguments of the Department in the Court of Appeals on April 25 that compliance with the Order was impossible.

As of May 15, 1975, the population of the Jail was 751, and twenty of those persons, all sentenced individuals, were being held in less than 48 square feet per man. All other persons at the Jail had at least 48 square feet each.

Following a request by plaintiffs' counsel, this Court held a further hearing on August 7, 1975, to investigate reports that the defendants were at that time not complying with the 48 square feet requirement. The population at the Jail on August 4 was 882 persons, 584 unsentenced, 255 sentenced and 43 being held on writs of habeas corpus *ad prosequendum* or *ad testificandum,* or in connection with a pending appeal.

Of the 584 unsentenced individuals present at the Jail on August 4, a study by the defendants revealed that nearly two-thirds of them (63%) had been held at the Jail longer than thirty days, and more than 20% had been held at the Jail in excess of four months.

On August 7, approximately 175–200 unsentenced individuals were being double-housed in cells measuring approximately six feet by eight feet. At the same time, a substantial number of the sentenced prisoners were either housed alone in the same size cell, or were housed in dormitory facilities where they enjoyed at least 48 square feet per man.

At the August 7 hearing, Charles M. Rodgers, the Assistant Director of Opera-

tions of the Department of Corrections, and the man specifically charged by the Director with the responsibility for compliance with this Court's Order of March 21, admitted that although he was familiar with that Order and with the Order issued by the United States Court of Appeals on May 2, 1975, he had nevertheless made no efforts to consult with the Chief Judges of the two trial courts in this jurisdiction, nor with the District of Columbia Bail Agency, as contemplated by the order of the Court of Appeals. Similarly, although the Department's report filed with this Court on May 16 stated that the Department would convert recreation space at the Jail to afford additional housing, Mr. Rodgers admitted that he had no intent to do so, and had no such intent at the time the report was filed with the Court.

As of August 7, no system had been established by the Department to determine whether or not the Jail was complying with the 48-square feet requirement; no consultation with the courts had been undertaken to attempt to expedite the sentencing of convicted individuals being held at the Jail awaiting sentencing; and, although this Court's Order applied only to pre-conviction detainees, no effort had been made to identify that class of persons as distinguished from those already convicted but awaiting sentencing.

During the course of the August 7 hearing, at the suggestion of this Court's Deputy Clerk, a simple method of identifying the plaintiff class was suggested to officials of the Department. This "reform", which involved a minor change in the Superior Court and District Court Clerks' offices' method of processing commitment papers, was subsequently put into effect, and as of August 18, the Jail has been able to identify the plaintiff class.

While some efforts were made by lower-level Department employees to reduce the population of the Jail, these efforts did not have a substantial impact on the crowding problem.

At the conclusion of the August 7 hearing, the Court scheduled another hearing

for August 15. At the latter hearing, the Court and counsel were joined by a representative of the Mayor's Office, as well as Department of Corrections officials. At the hearing, the Court was advised that the capacity of the Jail to house residents in 48 square feet had been increased, by two methods: (a) the capacity had been recomputed to include lavatory and hallway space in some housing areas, so that although no physical changes had been made to the structure of the Jail, the Department now felt that a larger number of persons could be housed in the same space as before without violating their right to 48 square feet per man; (b) "emergency funds" in excess of $10,000 had been made available by the Mayor's Office, which would enable the Jail to convert an area not previously used for housing to a dormitory. The Court was assured by the defendants that the Jail would be able to hold 951 individuals, allotting each at least 48 square feet, and that this would enable the Jail to be in compliance as of August 15. In addition, the Department represented that some movable housing units, known as "demountables", were available to the District Government, and that these also could be used if necessary. Finally, defendants assured the Court that notice would be given if the Jail's population increased to the extent that the 48 square feet rule was not being complied with.

Shortly after the August 15 hearing, the Court, accompanied by counsel for both sides, made an unannounced inspection of the Jail, and toured most of the housing units. The Court saw and spoke with inmates housed in Cell Block 2, where two men were confined in single cells, and confirmed the testimony adduced at trial on the physical aspects of overcrowding at the Jail.

On October 14, the Court was notified by defendants' counsel that the Jail was no longer complying with the space requirement, and had been out of compliance since September 16. A hearing was held on October 16, at which three employees of the Jail (Ronald Harbin, Records Office Super-

visor; Officer Roy Grillo, the recently appointed "compliance officer" charged with monitoring compliance with the space requirement; and Mr. Aubrey Kearney, the Administrator of the Jail) testified about compliance with the Order. Neither Mr. Rodgers nor Mr. Jackson, nor any representative of the City Government testified. No plan to bring the Jail back into compliance was presented, nor was there any evidence of good faith efforts by defendants to find solutions to the problem.

Statistical evidence presented reflected that, on September 8, 1975 (when the Jail was in compliance) there were 610 members of the plaintiff class at the Jail. In the following weeks, while there was some variation in this number, reaching a high of 621 on October 14, there has been a marked increase in the number of sentenced inmates at the Jail (170 on September 8, 225 on October 14).

Also there has been an increase in the number of persons awaiting trial, i. e. members of plaintiff class, with the proportion of detainees on surety bonds also on the increase.

Apart from converting other space to a new dormitory at the Jail, the Department and the city have made no substantial efforts to comply with the Order of this Court since its issuance in March; and there is no evidence of any contemplated effort to either reduce the population at the Jail or to provide additional space.

More significantly, the effort to comply with the Court of Appeals' May 2, 1975 Order is not a vigorous one. That Order is a virtual road map which if followed is bound to lead to compliance with the space requirements.

The most meaningful step in the direction of compliance is to seek effective implementation of the procedures governing the release of pre-trial detainees. The defendants have had enough experience in this area to be aware of the correlation between effectuating these procedures and reduction in the Jail population. Back on October 13, 1973, this Court issued an interim Order in this case, the second paragraph of which reads:

> Attorneys of the Public Defender Service and others designated by counsel for plaintiffs shall be forthwith admitted to the District of Columbia Jail for the purpose of conferring with inmates. Those attorneys shall take immediate action to present to the appropriate courts such non-frivolous claims of each inmate as can be heard on an emergency basis, either by notifying the attorneys already appointed for the inmates, or if such attorneys are unavailable or unwilling to take action, by presenting the claims themselves.

During the ensuing week, ending October 21, 1972, the number of persons Released in Court and Jail (a category which includes for the most part persons released on bail) made a dramatic jump to 103 persons from an average weekly figure far below that number.

Then again, within a week after this Court's March 21, 1975 Order, the Chief Judge of the District of Columbia Superior Court called a meeting which included representatives from the offices of the United States Attorney, the Corporation Counsel, and the Director of the District of Columbia Bail Agency. As a result of that meeting, Chief Judge Greene authorized J. William Erhardt, Esquire, the attorney in charge of the District of Columbia Bar Jail Project, to file motions for review of pre-trial release conditions on behalf of prisoners who were unable to obtain release pending their trials in the Superior Court. At the same time the Chief Judge specially assigned two judges to hear the motions.

Mr. Erhardt's effort in this regard consisted of contacting the attorney of record to communicate additional information concerning the inmate's eligibility for release on conditions other than a surety bond, and to request the attorney to seek his client's release under the provisions of the statute. In approximately 18 cases, because the attorney of record could not be contacted or refused to file bail review motions, Mr.

Erhardt filed these motions himself, and as a result at least four detainees were released. In approximately 110 cases where counsel of record agreed to file bail review motions on the basis of information transmitted to them by Mr. Erhardt, the result was that many more were released. At any rate, once again the Released In Court and At Jail category showed a substantial increase in numbers for the weeks ending April 5th and April 12th, far in excess of the average figures, and with the reduction in population the defendants were able to report that they were within the space requirements of the March 21, 1975 Order.

In their May 16, 1975 report to this Court pursuant to the Court of Appeals Order the defendants mention the meeting called by Chief Judge Greene (but neglect to mention that it was *sua sponte,* and not pursuant to any request by them). The defendants must try to reinstate the late March, 1975 arrangement, not merely for three weeks, as was the case then, but on a basis regular enough to achieve the rate of release demonstrated by Mr. Erhardt permanently. The defendants are further reminded that the city is obligated to make it possible for the Bail Agency to be adequately staffed,[1] to enable it to comply with the provisions of 23 D.C.Code § 1303(h)(6), which require monitoring of the pre-trial detainee population on a regular basis.[2]

The defendants claim to have moved as many persons as possible out of the Jail, but this does not appear to be the fact. During the August hearing it developed that defendants actually did not know the status of its population, and Mr. McGruder indicated that it would be "fruitful" if he could determine who among the "unsentenced" category were in fact convicted. At the time the Court's impression was that persons already convicted of felonies could in fact be sent to Lorton while awaiting sentence. But it now develops that the defendants feel bound by a form drawn by the Clerk's office which states that persons convicted are committed to the "Asylum and Jail". It appears feasible that if the form so binds the defendants (and the Court does not concede that it has that effect), some step should be taken to revise it. There is no compelling reason why convicted felons must remain at the Jail pending sentence.

The defendants do not appear to have taken advantage of applicable statutes. The local code (24 D.C.Code § 425) provides:

All prisoners convicted in the District of Columbia for any offense, including violations of municipal regulations and ordinances and Acts of Congress in the nature of municipal regulations and ordinances, shall be committed, for their terms of imprisonment, and to such types of institutions as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia Government, the feder-

---

1. The Director of the Agency testified that he was understaffed and therefore unable to comply with the law.

2. After nearly two hundred years this nation has recognized that the unnecessary jailing of persons merely accused of criminal conduct—regardless of the conditions of their confinement—is incompatible with our ideals of ordered liberty. This awareness has resulted in the Bail Reform legislation and to some extent in the Criminal Justice Act, providing for compensated counsel to represent indigent defendants. Both measures apply to the District of Columbia, and the defendants are obligated to take all steps necessary to assure their effectiveness.

The effectiveness of those measures is obviously heavily dependent upon the quality of the services rendered by defense attorneys in such cases. The District of Columbia, which pays both for these services and for the custody of pre-trial detainees not released on bail, cannot afford to be unconcerned with the ineffective assistance of counsel reflected by the dramatic rise in releases in the two above-described instances in which the rights of such detainees were pursued by or through the initiative of outside counsel.

al government, or otherwise, or whether within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or *relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined,* . . . (emphasis supplied)

The representations made relative to the U.S. Marshal and the inquiries made of the military authorities fall short of a direct request to the Attorney General to exercise his powers in this regard.

It would appear that the U.S. Marshal should be requested to move prisoners designated for other institutions in less time than three or four weeks.

Also, demountable housing units could be utilized at the Jail, the Lorton Complex, or elsewhere.

Finally, it is clear that the current problem facing the defendants is not likely to go away with the coming of the new jail facility, and continuous efforts are necessary to orchestrate the cooperative efforts necessary to effectively manage this aspect of the criminal justice process. This obviously requires the existence of a "Compliance Officer", but not on the level currently envisioned by defendants. For this purpose the defendants should designate a ranking official with the ongoing responsibility and authority to maintain effective liaison with the agencies necessarily involved if the detention facility is to be properly managed.