INMATES OF OCCOQUAN, individually and on behalf of all other persons similarly situated, et al.,

v.

Marion S. BARRY, Mayor, et al., Appellants (Two Cases).

Nos. 87–5055, 87–5295.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1988.

Decided April 12, 1988.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

Jere Krakoff, with whom Edward I. Koren, Amherst, N.Y., and Alexa P. Freeman, were on the brief, for appellees. Alvin J. Bronstein, Peter J. Nickles, Alan A. Pemberton and John F. Seymour, Washington, D.C., also entered appearances, for appellees.

Before STARR and SILBERMAN, Circuit Judges and HAROLD H. GREENE, Judge.[*]

Opinion for the Court filed by Circuit Judge STARR.

Dissenting Opinion filed by District Judge HAROLD H. GREENE.

[*] Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

STARR, Circuit Judge:

This case ushers us into the sensitive and difficult arena of prison-conditions litigation. In the wake of a prison riot, a number of inmates at the District of Columbia's facilities in Occoquan, Virginia, brought suit in federal district court, challenging their conditions of confinement as violative of the Eighth Amendment. The District Court sustained the challenge and entered a remedy imposing a population cap on the Occoquan facilities. For the reasons that follow, we are constrained to conclude that the District Court's analysis as to liability and its conclusions with respect to remedy failed to comport with governing Supreme Court precedent.

## I

### A

Seventeen inmates of Occoquan filed this class action under 42 U.S.C. § 1983 (1982), alleging that conditions at the prison violated the Eighth Amendment's prohibition against cruel and unusual punishment. The inmates promptly sought class certification and a preliminary injunction imposing a limit on the number of prisoners who could be housed at Occoquan. Nine days later, the District Court heard arguments and, at day's end, granted plaintiffs' motions for class certification and preliminary injunction.[1]

After further skirmishing, the District Court granted the District's motion for a stay of the preliminary injunction and, during pendency of the stay, conducted a ten-day trial on the merits of plaintiffs' Eighth Amendment claims. On December 22, 1986, the District Court filed its opinion and accompanying order entering judgment in plaintiffs' favor. The principal feature of the order was its imposition of a population cap on each of the nineteen housing units within the Occoquan facility and its requirement that the District of Columbia reduce the total number of prisoners to no more than 1,281 by June 1, 1987.[2] The District was also directed to submit written reports no later than January 15, 1987 indicating its plans for complying with the population limits and for remedying the extensive "deficiencies" enumerated in the court's opinion. Finally, the court required the District to submit follow-up reports at 30-day intervals.

After further proceedings, including an eventually failed attempt to join the Attorney General in the proceedings, *see Twelve John Does v. District of Columbia,* 841 F.2d 1133 (D.C.Cir.1988), the District Court in July 1987 issued an order disallowing further stays of the population caps pending appeal. In the meantime, inmate population levels had continued to grow to approximately 1,950 prisoners.[3] The court directed that the inmate population be reduced by no less than 100 inmates per month until the court-mandated limit of 1,281 inmates was reached.

### B

The District Court's opinion is reported at 650 F.Supp. 619 (D.D.C.1986). We are nonetheless constrained to canvass the District Court's findings of fact extensively, inasmuch as those findings, as well as the court's analytical approach to the case, are essential to understanding and resolving the issues on appeal.

The District Court's findings were set forth in five parts: (1) environmental conditions (broadly defined); (2) fire safety; (3)

---

1. The temporary injunction provided that the inmate population at each of the three Occoquan complexes should not exceed the capacity limits set forth by the consent decrees entered by the District Court in *John Doe v. District of Columbia,* No. 79-1726 (D.D.C.) and *Twelve John Does v. District of Columbia,* No. 80-2136 (D.D.C.). Those suits involved Eighth Amendment challenges by prisoners to the conditions at the District of Columbia's Maximum Security Institution and Lorton Central facility, respectively.

2. As of December 27, 1987, the inmate population at Occuquan was 1,678. Affidavit of Hallem H. Williams, Attachment 1 (filed July 21, 1987 with the District Court in support of plaintiffs' motion for preliminary injunction).

3. *See* Affidavit of Hallem H. Williams, Attachment 1, *supra* n. 2.

medical services; (4) mental health services; and (5) the cumulative impact of the conditions found "deficient."

### 1

The District Court analyzed "environmental conditions" by examining six specific areas: housing, food service, classification of inmates, programs for inmates, inmate supervision, and punitive segregation.

*Housing.* In its discussion of housing, the District Court pointed to a number of "deficiencies." It began by observing that both parties' public health experts agreed that the American Public Health Association ("APHA") standard, which prescribes 95 square feet per inmate, is "acceptable as a minimum standard."[4] *Id.* at 620. Applying the APHA standard, the court concluded that "the Occoquan Facilities do not provide adequate living space for inmates." *Id.* at 621. Noise levels in the dormitories were found to be "excessive" (under standards promulgated by the American Correctional Association ("ACA") and the Occupational Safety and Health Administration) and lighting to be "inadequate" (using a 30-foot-candle minimum, the APHA's recommended standard, as a benchmark). *Id.* at 621.[5]

General sanitation conditions in the dormitories were below "acceptable" environmental standards. *Id.* Here, the court pointed to several specific problems: (a) dormitory windows lacked screens, resulting in a fly infestation problem aggravated by a shortage of disinfectant for use in toilet and shower areas; (b) failure to clean or sanitize mattresses used by inmates between users and failure to supply mattress covers; and (c) torn and damaged mattresses.

The cumulative effect of these conditions, the court found, created serious health risks for inmates. The court pointed to testimony that "[c]onfining excessive numbers of people in limited spaces significantly increases the risk of transmission of airborne diseases." *Id.* Moreover, "sustained excessive noise levels increase stress levels and pose a significant risk to inmates' physical and mental health." *Id.* Inadequate lighting could lead to accidents and inhibit work, reading, and recreational activities. Damaged and soiled mattresses could become a vehicle for transmission of disease. These risks were compounded by "inadequate" ventilation in the dormitories and "inadequate" medical screening of inmates entering the prison.[6] *See infra* p. 833.

Conditions in three dormitories were viewed as particularly troublesome. Dormitories J–1, J–2, and 5 were warehouses hastily converted into housing. Dormitory 5 was situated in the basement of the Occoquan gymnasium. All three facilities suffered from the inadequacies observed above, but these facilities, the District Court found, were particularly cramped and poorly ventilated. Poor ventilation at the J–1 and J–2 dormitories was exacerbated by acrid fumes from a nearby coal pile.

*Food Services.* The court observed that "neither [side's] expert felt that the conditions in the kitchen posed any imminent threat of harm to the inmates." *Id.* at 622. Nevertheless, the court faulted Occoquan's food facilities because they failed to conform to APHA standards with respect to kitchen space. Although APHA recommends seven to nine square feet of kitchen space per inmate, Occoquan's facilities were, under that standard, adequate for

---

**4.** On cross-examination, defendants' expert, Mr. Gordon, stated that he would "endorse" the APHA standard; he did not state that he believed that standard to represent the constitutional minimum. The court observed that the APHA standards "were written by environmental health and safety professionals" and that they are "supported by epidemiological evidence." 650 F.Supp. at 620.

**5.** There was testimony that the excessive noise was caused by unregulated volume settings on the television sets in the dormitories. Tr. 1125–27, 1145, 1152. Defendants' expert witness recommended that prison authorities install volume governors in the sets or change their location. Tr. 1126.

**6.** The court cited no testimony that these conditions had in fact led to increased disease among the inmate population.

only 696 inmates (rather than the 1637 then in residence, *id.* at 620).

The District Court additionally made a number of highly specific observations. First, it expressed concern about the adequacy of the contractual arrangements with an outside food service vendor to provide meals.[7] Second, the court found that food storage areas were "filled beyond capacity" with "insufficient space in the refrigerated areas to thaw frozen meat in a safe manner." *Id.* at 622. Third, the court observed that although prison authorities had recently undertaken an "aggressive vermin control program," they nonetheless "acknowledged the existence of a prior infestation." *Id.* at 623. Finally, the court found fault with the lack of a preventative maintenance program for the kitchen facilities, as evidenced by missing window screens and broken freezer gaskets. The want of such a program, the court concluded, "has serious adverse health and safety implications that are only compounded by greater numbers of inmates using these facilities." *Id.*[8]

*Inmate Classification.* The District Court was also critical of Occoquan's inmate classification system. The court cited ACA standards and other testimony discouraging the use of dormitory housing save for minimum security prisoners classified for group living. As a result of court-ordered population caps on other District of Columbia prison facilities, Occoquan was forced to house maximum security inmates together with the general prison population that included misdemeanants. In the court's view, it was important that violent inmates and those in need of psychiatric care be identified, so that they could be segregated from the remainder of the prison population. The court believed Occoquan's staff inadequate to the task and observed that the classification system at

Occoquan appeared "dangerously overtaxed." *Id.*

*Programs.* The District Court decried Occoquan's lack of adequate activities and programs for inmates. Penologists, the court noted, uniformly agree that "inmates should be engaged in some productive enterprise, properly supervised." *Id.* Furthermore, "[b]oth parties agreed that Occoquan needs to develop a prison industries program and provide more space for programmed activities." *Id.* at 624.[9] Occoquan failed to provide "meaningful program opportunities." *Id.* at 623. As a result, "enforced idleness presents a major problem" that could potentially lead to "heightened tension, frustration, and violence." *Id.*

*Security and Supervision.* The District Court was critical of the level of supervision exercised by prison personnel in the sleeping areas of the dormitories. Patrols were infrequent and irregular; correctional officers were not strategically stationed. Occoquan departed from "sound correctional practice," *id.* at 624, by practicing double bunking in some dormitories. This practice resulted in obstructed lines of sight for supervisory personnel. In addition, inmates were sometimes allowed to exercise authority over other inmates, a practice disapproved by experts on both sides.

Without specifically saying so, the District Court appeared to find a causal link between security practices and the level of violence in the prison. The court observed that defendants' own statistics showed that over the past year at least 40 serious assaults had occurred, including five with shanks and three with pipes. Three inmates testified about specific incidents of violence in which they had been targets. Because less serious fistfights did not fall within the ambit of "assaults," the court concluded that "the level of violence at

---

7. The vendor was contractually obligated to serve three meals a day to a maximum of only 1,400 inmates, with an option to increase to 1,600 with 30 days notice. There was, however, no testimony that food service had been disrupted or inadequate.

8. There was, however, no testimony that the lack of regular maintenance had lead to inmate illness or accidents.

9. The District Court cited testimony of defendants' expert witness, George Camp, who agreed that Occoquan "could use" a prison industries program. Tr. at 1192.

Occoquan is significantly greater than defendants' statistics reflect." *Id.* The court cited no evidence comparing the incidence of violence at Occoquan to that at other institutions and made no findings of a comparative nature.[10] Nevertheless, the court found "not well supported" expert testimony to the effect that the assault rate was "unremarkable." *See id.;* Tr. at 1178–79.

*Segregation of Q Block.* Also found wanting was the use of Occoquan's only cell-block, Dormitory Q, as a holding area for inmates of different classifications who prison officials determined for a variety of reasons should be kept apart from the prison's general population. The cell-block houses inmates placed there for disciplinary reasons, those under protective custody, inmates first entering the Occoquan complex, and inmates with mental health problems. Although the inmates are separated by cells, the court found the practice of mixing these prisoners together a departure from "sound correctional practice." *Id.* at 625.

The lack of programs and exercise for inmates assigned to Dormitory Q likewise troubled the court. Inmates in that facility were permitted very little exercise—a thrice-weekly walk in the corridor outside their respective cells, for about a half hour. Psychological testimony was cited for the proposition that these conditions lead to "psychoses in inmates who suffered no apparent mental health problem before being placed in Q block." *Id.* The District Court deemed it significant that "[b]oth parties' experts were in complete agreement" that inmates held in protective custody and for disciplinary reasons at Dormitory Q

"should be permitted" daily exercise and access to prison programs. *Id.*

### 2

Fire safety at Occoquan was found "inadequate" in a number of respects. The court was of the view that "[the Life Safety Code] constitutes the minimum standards for fire safety in a correctional setting." *Id.* at 626.[11] Many of Occoquan's facilities—particularly those that had undergone recent renovation and were therefore subject to more stringent code provisions applicable to new buildings—failed to pass muster under existing codes, "let alone the more enlightened building standards under the Life Safety Code." *Id.*

The District Court credited testimony by plaintiffs' expert that the fire alarm systems were "deficient." *Id.* Many of the alarms and smoke detectors were not in working order; none provided automatic retransmission to sound the alarm in the prison Control Center as well as at the site of the alarm. The court counseled that installation of an automatic retransmission system "may well be advised." *Id.*

Most fire extinguishers were water-type, which the court found "inadequate to extinguish an electrical fire." *Id.* Many were not situated in their proper locations and were overdue for servicing. Electrical wiring was exposed in many places, exacerbating the risk of fire. Also found troubling was the lack of "adequate" emergency lighting in Occoquan's dormitories, *id.,* and the failure to provide "adequate" evacuation plans and training for prison staff. *Id.* at 627.[12]

10. In fact, on several occasions the court sustained plaintiffs' objections to defendants' efforts on cross-examination to elicit comparative testimony. Tr. 123, 721–22.

11. The court assumed that two sets of standards might be applicable to the facilities at Occoquan: the District of Columbia Building Code, although it does not specifically address correctional facilities, and the "Life Safety Code"—a professional standard developed specifically for detention and correctional facilities by the National Fire Protection Association. Although between 20 to 25 States have adopted the Life

Safety Code for application to their prisons, the District of Columbia apparently has not. In any event, plaintiffs advanced no statutory claim based upon code violations.

12. Specifically, the court found the plans lacking because they failed to specify whom correctional officers were to call first in the event of an emergency; failed to provide separate plans for different buildings; and, in the case of Dormitories K–1 and K–2, failed to call for a second officer to be stationed outside the dormitories to unlock the rear exit to facilitate evacuation.

The third broad category examined by the District Court was Occoquan's provision of medical services. The court began by observing that experts on both sides "agreed that deficiencies [in Occoquan's medical care] exist." *Id.* The experts concurred that "the APHA and the ACA standards for health care ... represent the accepted minimums in this area." *Id.* Against this backdrop, the court addressed eight separate aspects of medical care: sick call, staff, emergency care, chronic care and records, screening, specialty clinics, medications, and dental care.

The District Court found "insufficient" the prison's practice of providing formalized sick call—opportunities for prisoners to get routine medical attention—only three times per week. *Id.* at 628. Expert testimony was cited to the effect that Occoquan "ought to conduct formalized sick call ... at least five times per week." *Id.*

By the time of trial, Occoquan's medical staff consisted of one full-time and one part-time physician, three physician assistants ("PA"), and three medical technician assistants ("MTA"). PA's have limited formal medical training; MTA's typically have only on-the-job training received while serving in the Armed Forces. MTA's were allowed to perform individual diagnoses, despite the fact that "such a practice is considered improper." *Id.* Only one of the PA's had formal certification, despite the fact that "state or national certification is recommended." *Id.*

The medical staff was inadequate to the job at hand, the court concluded, noting agreement among experts that for a prison population of approximately 1,500 inmates, Occoquan "needed" two or three full-time physicians and three to five "properly certified" PA's. *Id.* Also found lacking was the want of medical coverage during the midnight shift.

A number of aspects of emergency medical care troubled the court. Dissatisfaction was expressed with the lack of training in cardiopulmonary resuscitation ("CPR") among both correctional officers and medical personnel. The prison ambulance was not "properly equipped." In general, Occoquan had "only inadequate emergency equipment." *Id.*

The District Court cited testimony about specific instances of delay in the administration of medical care to inmates as illustrating the "systemic nature of the problem with emergency care at Occoquan." *Id.* One inmate had to wait 45 minutes for a stretcher to arrive after striking his head against the back of a bunk; another was forced to wait over an hour before being transferred to Central Facility for emergency care.

The court criticized the lack of formal procedures to ensure that adequate follow-up care would be given to sick or injured inmates. The court cited examples of failure to renew an inmate's seizure medication in timely fashion and to follow up on an inmate who required suture removal. The trial judge expressed concern over significant delays in obtaining medical records for inmates following their intake processing at the D.C. Jail or treatment at the D.C. General Hospital. Testimony by defendants' medical expert was cited to the effect that "additional records and clerical personnel are needed" to alleviate the problem. *Id.* at 629.

The court noted that proper documentation of screening tests for communicable diseases—conducted on all prisoners entering the D.C. correctional system at the D.C. Jail—often failed to accompany inmates' transfers to Occoquan. This was of particular significance because a population such as that at Occoquan could be expected to test positive for such diseases "with some frequency." *Id.* Indeed, the District Court cited testimony concerning "specific instances of infected inmates whose conditions were not documented or followed properly." *Id.*

The court below also found that "[i]nordinately long and significant delays" confront inmates who need to visit specialty clinics. *Id.* The trial judge recounted the experience of one inmate who had been referred to the surgery clinic to be seen "as soon as possible," but was still waiting

for an appointment over three months later. *Id.*

Medications, the court observed, are often distributed by MTA's, although they are not certified to do so, and prescriptions signed by PA's were not routinely countersigned by a physician, "even though such a practice is required." *Id.* No procedures were in place to ensure that prescription renewals were made and that documentation of prescription processing was complete. Also, prison authorities had difficulty ensuring that diabetic inmates received insulin injections in a timely manner.

Finally as to medical services, the court was critical of dental care at Occoquan. The court credited testimony that the current staff of two dentists and one dental assistant was "insufficient to handle the current population's needs." *Id.* at 629–30. The trial judge commented that testimony concerning lengthy delays was "buttressed by the numerous administrative complaints filed by inmates complaining of the pain they are suffering due to these delays." *Id.* at 630.

### 4

Four areas of the mental health services provided by Occoquan troubled the District Court. First, the informal system of screening inmates for psychological problems was deemed "entirely inadequate" because it was not conducted by "trained mental health professional[s]" and did not include "appropriate psychological tests." *Id.* Second, the court pointed to "widely acknowledged deficiencies" with respect to the mental health staff at Occoquan, "evidenced by a 'burned out' staff, overwhelmed by their work load." *Id.* The court noted a "pressing need for additional mental health personnel." *Id.* Third, based on testimony from mental health experts on both sides, the court found that "Q block is an inappropriate place to house inmates suffering from serious mental health problems." *Id.* Inmates in need of

13. The court made separate note of medical care at Occoquan, holding that appellants' "cavalier attitude" with respect to the prison's inadequate medical services violated constitutional

hospitalization for mental health treatment were not being transferred in a timely fashion. Finally, some mentally ill inmates at Occoquan were not receiving medications prescribed for them. Moreover, according to the court, the unavailability of various medical records posed a problem for the facility.

### 5

The District Court concluded its detailed factual recitation with a discussion of the cumulative impact of its findings. The trial judge believed that "conditions at Occoquan, not to mention the experts on both sides and the Occoquan administrators, cry out for a population cap." *Id.* at 630–31. The court was of the view that "virtually every facet of the Occoquan system is at or beyond the breaking point." *Id.* at 631. The District Court concluded with the following observation:

> It is apparent that even with significantly fewer inmates, the physical plant and the various services and programs at Occoquan are, at best, substandard. This situation, taken cumulatively, presents a clear and present danger to the health and safety of plaintiffs.

*Id.*

Having set forth its findings of fact, the District Court summarized its conclusions of law as follows:

> Every facet of the operation at Occoquan is characterized by systemic deficiencies. While any one component, *i.e.*, harmful noise levels, food services, etc., may not fall below the prescribed eighth amendment standard, the cumulation of the various deficiencies aggravated and exacerbated by an ever-increasing number of inmates creates a constitutionally unacceptable situation.

*Id.* at 632.[13]

Relying on its broad equitable powers once a constitutional violation is found, the court then ordered the population limits referred to previously. *See supra* p. 3. It

standards articulated in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). 650 F.Supp. at 633.

did not fashion a specific remedy tailored to specific findings of constitutional violations.[14]

## II

The framework for analysis in this case was established by the Supreme Court in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). There, the Court faced for the first time the meaning of the Eighth Amendment's prohibition against cruel and unusual punishment in the setting of a challenge to conditions of confinement. Although cases prior to *Rhodes* had made clear that prison conditions were subject to Eighth Amendment scrutiny, *id.* at 345, 101 S.Ct. at 2398, the Court had not theretofore been squarely confronted with a challenge requiring articulation of "the principles relevant to assessing claims that conditions of confinement violate the Eighth Amendment." *Id. Rhodes* was thus a ground-breaking decision. It was manifestly more than a narrow decision establishing the limited principle that double celling *per se* does not work a violation of the Eighth Amendment. To be sure, *Rhodes* held just that, but the Court took the occasion to articulate more broadly the principles to guide the lower courts in coming to grips with this difficult area of constitutional litigation.

The themes of *Rhodes* are clear. The judiciary is to be cautious in the sensitive terrain of the Eighth Amendment. In writing for the majority, Justice Powell made the point in the following way:

This Court must proceed cautiously in making an Eighth Amendment judgment because, unless we reverse it, "[a] decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment," and thus "[r]evisions

cannot be made in the light of further experience."

*Id.,* 452 U.S. at 351, 101 S.Ct. at 2401 (quoting *Gregg v. Georgia,* 428 U.S. 153, 176, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976)). The Court was not blind to the harsh reality of prison conditions in America; but that reality did not mean that judicial caution was to be thrown to the winds. "[T]he problems of prisons in America are complex and intractable, and more to the point, they are not readily susceptible to resolution by decree." *Id.* 452 U.S. at 351 n. 16, 101 S.Ct. at 2401 n. 16 (quoting *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1976)).

Writing in 1981, five years after *Martinez,* the *Rhodes* Court indicated its keen awareness of the exacerbation of problems afflicting prison systems across the country. "Since our decision in *Martinez,* the problems of prison population and administration have been exacerbated by the increase of serious crime and the effect of inflation on the resources of States and communities." *Id.* This observation touched upon a broader principle that the Court has often emphasized; ultimately, the administration of prisons implicates broader concerns over judicial competence to decree sweeping modifications in prison conditions. That is, in addition to *Rhodes*-mandated caution about carving correctional *desiderata* into constitutional stone, the Court has instructed the lower courts that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979). *See also Procunier v. Martinez, supra,* 416 U.S. at 405, 94 S.Ct. at 1807.

*Rhodes* thus rearticulated the recurring theme of judicial caution in the area of

**14.** The court observed that duties of administering prisons obviously fell to prison authorities themselves, not to courts. This seemed to suggest the court's apparent view, echoed in the dissent, *see* dis. op. at 855, that a population cap represented a less intrusive remedy than a more detailed order going to specific constitutional violations. At the same time, however,

the court's reliance upon a "totality of the circumstances" analysis, *see infra* at p. 839, seemingly suggested that, in the trial judge's view, remedying specific areas of concern would not cure the "true" violation, which boiled down to too many prisoners at Occoquan. Our dissenting colleague takes a similar position. Dis. op. at 853.

institutional conditions litigation. Certain basic elements of prison life are, Justice Powell reminded us, matters entrusted to correctional officials, not judges. The Court stated it simply: "[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14. Formidable authority was summoned to buttress that proposition, including *Bell v. Wolfish, supra,* 441 U.S. at 551, 99 S.Ct. at 1880–81; *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541–42, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

*Rhodes* thus stands as a reminder to lower courts to adhere to basic principles. And those principles clearly signal caution as we proceed into the inner workings of a prison, armed with the demands of the Eighth Amendment. As Justice Brennan aptly stated in concurring in *Rhodes,* "[c]ourts must and do recognize the primacy of the legislative and executive authorities in the administration of prisons." 452 U.S. at 362, 101 S.Ct. at 2407.

But there is more to *Rhodes* than a reminder of enduring principles. The *Rhodes* Court also set forth a framework for analysis of Eighth Amendment challenges. Drawing from its prior cases, the Court emphasized the Amendment's prohibition of "punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.'" *Id.* at 346, 101 S.Ct. at 2399 (quoting *Gregg v. Georgia, supra,* 428 U.S. at 173, 96 S.Ct. at 2925). The Court indicated that Eighth Amendment judgments are not to be governed by the peculiar views of individual trial judges. The courts are, rather, to search for objective factors to guide constitutional analysis. The exercise is, to be sure, not mechanical in nature; "'the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability of a given punishment.'" *Id.* 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977)). But judges are to be guided by principles, not impressions; and the ultimate constitutional principle articulated by *Rhodes* was this: "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting punishment." *Id.* 452 U.S. at 347, 101 S.Ct. at 2399.

In fleshing out this principle, the Court in *Rhodes* articulated (in the context of the conditions prevailing at the Ohio prison at issue) the proposition that not all deprivations rise to constitutional significance. Indeed, certain sorts of "deprivations," such as limited work and educational opportunities, do not even fall within the broad compass of "punishments" within the meaning of the Constitution. *Id.* at 348, 101 S.Ct. at 2400. Instead, *the "deprivations" that trigger Eighth Amendment scrutiny are deprivations of essential human needs.* Specifically, the conditions the *Rhodes* majority thought significant were these: "deprivations of essential food, medical care, or sanitation." *Id.* And to that list of basic needs, the Court added concern over physical safety. *Id.* When measured against this demanding yardstick, the allegation of overcrowding did not even come close to establishing a constitutional violation. Even though this condition was not, by virtue of prison capacity, temporary in nature, the Court was unmoved:

> These general considerations fall far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment.

*Id.*

The Court brushed aside the asserted significance of expert testimony, which had formed an integral part of the two lower courts' agreement that conditions in the Ohio facility did not meet the Eighth Amendment's demands. The *Rhodes* court flatly discounted expert opinion. *Of greatest import under the Constitution is the public's attitude toward a given sanction*

*or condition.* Justice Powell wrote for his colleagues in the following way:

> Indeed, generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as "the public attitude toward a given sanction."

*Id.* at 348–49 n. 13, 101 S.Ct. at 2400 n. 13 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). The basis of the expert testimony adduced at trial had been, not surprisingly, the standards of professional organizations. *Rhodes* reaffirmed the Court's view in this respect, laid down two years earlier in *Bell v. Wolfish:* "[T]he recommendations of these various [professional] groups ... simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." 441 U.S. at 544 n. 27, 99 S.Ct. at 1876 n. 27. Once again rejecting professional standards as doing service for constitutional benchmarks, the *Rhodes* Court observed that the conditions in question, although falling below professional standards, did not violate "decency." The cells were heated, ventilated, and equipped with hot and cold running water, and a sanitary toilet.

The demand for objective facts going to essential human needs is, we believe, the clear message of *Rhodes.* It will not do to assert that there are "deficiencies" in the prison. Nor will it do to invoke the standards of professional organizations as showing failings of purportedly constitutional significance. In this setting, it is decency—elementary decency—not professionalism that the Eighth Amendment is all about.

This basic insight was, we think, instructively captured by our colleagues in the Eighth Circuit recently. Sitting *en banc,* the court had occasion to review the findings of a district court which had concluded that conditions in a South Dakota prison facility fell below constitutional norms. *Cody v. Hillard,* 830 F.2d 912 (8th Cir. 1987) (en banc), *cert. denied,* — U.S. —, 108 S.Ct. 1078, 98 L.Ed.2d 237 (1988). After canvassing the District Court's findings

and finding them wanting, the *en banc* court had this to say:

> The conditions described in this record cannot be said "to inflict pain or amount to punishment," nor can prison administrators making "sincere efforts" be said not to be acting in "good faith." The present case is light years removed from the torture, cruel deprivation, and sadistic punishment with which the Cruel and Unusual Punishments Clause is concerned.

*Id.* at 915.

It is, in short, these latter sorts of conditions that the Eighth Amendment will not tolerate. It is cruel conditions, defined by reference to community norms, to which the Constitution speaks; neither "deficient" conditions nor conditions that violate "professional standards" rise to the lofty heights of constitutional significance. Indeed, the obvious danger of employing professional standards as benchmarks is that they ineluctably take the judicial eye off of core constitutional concerns and tend to lead the judiciary into the forbidden domain of prison reform. And the line between discerning and remedying constitutional violations, on the one hand, and mandating reforms to improve the quality of life behind prison walls, on the other, is of pivotal importance to judicial legitimacy in a democratic society.

In its search for principled lines, the *Cody* court's succinct formulation of core Eighth Amendment concerns is, in our view, entirely harmonious with *Rhodes* itself. We have already canvassed the majority opinion authored by Justice Powell, with its emphasis on deprivations of *essential human needs.* This conclusion was reached, we cannot but observe, in the face of a vigorous dissent by Justice Marshall who, invoking the specific findings of the trial court, pointed to expert testimony that the conditions prevailing at the Ohio prison would cause "serious mental, emotional, and physical deterioration." 452 U.S. at 371, 101 S.Ct. at 2411–12 (Marshall, J., dissenting). The dissent was emphatic; Justice Marshall emphasized that the trial judge, whose judgment had been affirmed

by the Sixth Circuit, had concluded that the Ohio conditions necessarily involved "physical and mental injury." *Id.* at 374, 101 S.Ct. at 2413. Particularly in the face of Justice Marshall's vigorous dissent, it is clear beyond cavil that *Rhodes* was not about abstract principles or per se rules; it was about whether the indisputably undesirable conditions in the Ohio facility passed constitutional muster.

Among the eight Justices who rejected the lower courts' conclusion that constitutional infirmities infected the facility in question was Justice Brennan. His concurring opinion, joined by two colleagues, is likewise instructive in getting at the core of the Eighth Amendment's meaning in the context of prison conditions litigation. There, Justice Brennan spoke of " 'soul-chilling inhumanity of conditions.' " 452 U.S. at 354, 101 S.Ct. at 2403 (quoting *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 684 (D.Mass.1973)). The cases Justice Brennan discussed in reviewing the judicial literature were of the very sort identified by the Eighth Circuit in *Cody*. These were cases involving conditions of unspeakable inhumanity. Here, by way of example, is a portion of Justice Brennan's description, drawing in turn from an opinion of then-Chief Judge Frank Johnson about one such system:

> The institutions were "horrendously overcrowded to the point where some inmates were forced to sleep on mattresses spread on floors in hallways and next to urinals." The physical facilities were "delapidat[ed]" and "filthy," the cells infested with roaches, flies, mosquitoes and other vermin. Sanitation facilities were limited and in ill repair, emitting an "overpowering odor"; in one instance over 200 men were forced to share one toilet. Inmates were not provided with toothpaste, toothbrush, shampoo, shaving cream, razors, combs, or other such necessities.... A United States health officer described the prisons as "wholly unfit for human habitation according to virtually every criterion used for evaluation by public health inspectors." Perhaps the worst of all was the "rampant violence" within the

prison. Weaker inmates were "repeatedly victimized" by the stronger, robbery, rape, extortion, theft, and assault were "everyday occurrences among the general inmate population."

*Id.* 452 U.S. at 355, 101 S.Ct. at 2403–04 (citations omitted).

This sort of prison system was not unique. In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Court noted unchallenged findings by the lower court that the Arkansas prison system subjected inmates to conditions amounting to " 'a dark and evil world completely alien to the free world.' " *Id.* at 681, 98 S.Ct. at 2569 (quoting *Holt v. Sarver*, 309 F.Supp. 362, 381 (E.D.Ark.1970) (*Holt II*)). This was not hyperbole by judges carried away with the harsh realities of prison life. The following description by Justice Stevens, writing for the Court in *Hutto*, powerfully conveys the sinister reality of the Arkansas system:

> [T]he institution at the center of this litigation[ ] required its 1,000 inmates to work in the fields 10 hours a day, six days a week, using mule-drawn tools and tending crops by hand. The inmates were sometimes required to run to and from the fields, with a guard in an automobile or on horseback driving them on. They worked in all sorts of weather, so long as the temperature was above freezing, sometimes in unsuitably light clothing or without shoes.
>
> .     .     .     .     . .
>
> Inmates were lashed with a wooden-handled leather strap five feet long and four inches wide.
>
> .     .     .     .     .
>
> The "Tucker telephone," a hand-cranked device, was used to administer electrical shocks to various sensitive parts of an inmate's body.
>
> .     .     .     .     .
>
> Most of the guards were simply inmates who had been issued guns. Although it had 1,000 prisoners, [the prison] employed only eight guards who were not themselves convicts. Only two nonconvict guards kept watch over the

1,000 men at night. While the "trusties" maintained an appearance of order, they took a high toll from the other prisoners. Inmates could obtain access to medical treatment only if they bribed the trusty in charge of sick call. As the District Court found, it was "within the power of a trusty guard to murder another inmate with practical impunity...."

*Id.* 437 U.S. at 681–82 & nn. 3–6, 98 S.Ct. at 2569 & nn. 3–6 (citations omitted).

It was against this wretched backdrop that the *Rhodes* Court articulated the twin evils of "wanton and unnecessary infliction of pain" and conditions "grossly disproportionate to the severity of the crime." The Court cited two examples as *illustrative* of conditions condemned by the Eighth Amendment: the deliberate indifference to an inmate's serious medical needs, such as that at issue in the case of *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); and the conditions, which we just recounted, prevailing in the prison system of Arkansas which provided the backdrop of *Hutto v. Finney, supra.* ("[T]he conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs." *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399). On the heels of citing these two examples, the *Rhodes* Court employed language which is said to signal its embrace of a "totality of the circumstances" test, the theory of the plaintiffs' case now before us.

> Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.

*Id.*

But to say that the *Rhodes* Court sanctioned a "totality of the circumstances" approach (as evidenced by Justice Brennan's characterization in his concurrence, 452 U.S. at 363 n. 10, 101 S.Ct. at 2398 n. 10; *see also Hutto v. Finney,* 437 U.S. at 687, 98 S.Ct. at 2571–72) is to recount only half of the Court's formulation; it is the second part that provides content and specificity to the test—*deprivations of "the minimal civilized measure of life's necessities."*

In light of this standard (or, at least, mandated approach to constitutional analysis), we need not tarry long in indicating why the District Court's analysis in the present case misses the mark. Time and again, the District Court pointed to "deficiencies" in conditions prevailing at the Occoquan facilities. Time and again, the court referred to the standards promulgated by various professional organizations or "agreement" among the experts concerning "sound correctional practice." This approach, as we read the court's opinion, provided the foundation for its conclusion that liability was established under the "totality of the circumstances." But what we see, unfortunately, wanting in the analysis is a determination that these "deficiencies" and shortfalls—alone or in combination—rose to the level of deprivations of the "minimal civilized measure of life's necessities." Those necessities—food, shelter, health care, and personal security—must be analysed with specificity to determine whether *essential* mainstays of life have been denied to the inmates of Occoquan. If the necessities are provided, then the Eighth Amendment has been satisfied (apart of course from any claim, not asserted here, that the conditions are disproportionately severe in view of the various offenses for which the inmates stand convicted).

By virtue of the District Court's misconception of the applicable constitutional standard, its liability analysis is fatally infected with error. Its approach, with all respect, simply cannot be squared with *Rhodes.* Reading the court's opinion, with its elaborate recitation of expert testimony at trial concerning "sound correctional practice," we are unable to discern whether the conditions as described rose to the level of deprivations of constitutional moment. That the conditions were undesirable and indeed harsh does not, as should by now be evident, aid constitutional analysis. The Eighth Amendment gets at the basic necessities of life; it does not go to the undesira-

bility of conditions to which inmates are subjected.[15]

We do not, however, go so far as to conclude that the District Court could not have found on this record conditions falling within the zone of legitimate constitutional concern. Several areas discussed by the court give us pause and may be of such seriousness as to warrant further analysis under the appropriate constitutional standards as elucidated by the Supreme Court's holdings in such cases as *Estelle, Hutto,* and *Rhodes.*[16]

But we can make no such determination on the record before us without, in effect, performing the District Court's task. And, crucially, the record is already stale. The

District has represented to us that it has already addressed and remedied many (if not all) of the specific "deficiencies" enumerated by the trial court. Indeed, at oral argument counsel for the District represented that the local government's concern in the appellate stage of this litigation was solely with the population cap; in fact, counsel indicated that the District was keenly interested in correcting (and had corrected) conditions found unacceptable by the District Court.[17]

As we will more fully develop in Part III of this opinion, *if* there still exist conditions violative of constitutional commands, then the task of the court is to remedy the offending conditions. But in our view, the District Court succumbed to the very error

---

15. Our dissenting colleague asserts that the District Court used the term "deficiency" as a shorthand for constitutional violations or deprivations. Dis. op. at 849 n. 21. We respectfully disagree. Read fairly, the District Court's opinion tallies up a series of "deficiencies" below specified norms, usually supplied by professional organizations, and, without further analysis as to whether any of these "deficiencies" amount to constitutional violations, concludes that, in aggregate, they constitute a violation of the Eighth Amendment. It is precisely this failure to draw the critical distinction between deficiencies and constitutional violations that led the District Court into grave error. Because this error infects the District Court's entire analysis, we cannot agree with the dissent that "the record in this case demonstrates at least some such deprivations." Dis. op. at 847. *See infra* n. 16.

16. The trial court was, helpfully, more specific in its constitutional analysis (and truer to the Supreme Court's mandated approach) in regard to medical conditions at Occoquan. *See supra* n. 13. Because of our disposition of this case, however, we need not pass upon, and express no opinion with respect to, the specific question whether the conditions at Occoquan fell within the Supreme Court's "deliberate indifference" standard enunciated in *Estelle v. Gamble, supra. See also infra* n. 17 (noting, *inter alia,* reports of recent improvements in medical care).

17. Appellants' Report to the [District] Court, filed June 10, 1987, detailed improvements that the District has made in virtually every area of deficiency noted in the District Court's opinion. Among the improvements, over 1300 new fire retardant mattresses had been ordered, window screens had been installed on all dormitory windows theretofore lacking them, and medical staff had been increased from one to three full-time physicians.

The District also reported that it had implemented a number of new procedures. The prison had in place (1) new general housekeeping procedures to ensure sanitary conditions; (2) a routine fire inspection schedule; (3) new evacuation plans and training in implementing them; (4) sick call five days per week; and (5) new procedures for medical record transfers and follow-up medical care for inmates.

In addition, as part of its phased construction program at Occoquan, the District has undertaken renovation of Dormitories J–1, J–2, and 5, which the reader will recall were found particularly inadequate with respect to ventilation, wiring, and emergency lighting. *See* Report to the [District] Court at 10 (filed January 29, 1987). Our dissenting colleague complains, with respect to the District's work here, that "bids for a contract to perform the work were opened ... ten months after the relevant order was entered." Dis. op. at 855. But having undertaken such major construction work, the District has naturally been required to commission and approve design drawings and compile contract specifications before letting the project out to bid. Although greater speed and efficiency are surely desirable, all of this, it goes without saying, takes time.

As the controversy over these three units illustrates, it is clear from the record that some of the dorms at Occoquan are worse than others; it is for this very reason that a *tailored* approach to remedies is appropriate. *See infra* Part III.

The dissent argues that we should totally discount representations by the District of Columbia with respect to improvements at Occoquan. Dis. op. at 853. As should be clear from the litany of improvements noted above, however, what we have before us are not representations of counsel or mere promises of progress. Rather, we rely on reports of actual improvements described in the record.

discerned by the Eighth Circuit in the South Dakota litigation, namely that a variety of deficiencies in the prisons in question warranted a global remedy (an end to double-celling), rather than a remedy mandating specific corrections of specific problems:

> The District Court detailed such problems ... as unsanitary practices in storing and preparing food, the use of untrained inmates to provide medical services to other inmates, inadequate ventilation and plumbing and substandard electrical wiring and other fire hazards. Whatever the merit of these findings, there has been no showing, and the District Court has made no finding, that the elimination of double-celling will alleviate these problems to any perceptible degree. *An appropriate remedy would relate to correction of the constitutionally deficient conditions that have been found to exist, if any there be, rather than to the elimination of double-celling.*

*Cody v. Hillard,* 830 F.2d at 914 (emphasis added).

### III

This, finally, brings the remedial aspect of the District Court's order into sharp relief. It has long been held that the equitable power of the federal courts will be brought to bear to insure that constitutional wrongs will be effectively redressed. But the breadth and flexibility inherent in equity have limits. Certain bedrock and frequently reaffirmed limiting principles are to guide the trial courts in their employment of equity's power.

### A

■ First and foremost, once a right is established the remedy chosen must be tailored to fit the violation. The Supreme Court has made the point this way: "The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation." *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (*Milliken I*). Equitable remedies in constitutional cases must therefore seek to redress the "condition alleged to offend the Constitution." *Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken II*). Second, the remedy chosen must in fact be remedial in nature. That is, the remedy must seek to cure the constitutional violation, to place victims of unconstitutional conduct in " 'the position they would have occupied in the absence of such conduct.' " *Milliken II,* 433 U.S. at 280, 97 S.Ct. at 2757 (quoting *Milliken I,* 418 U.S. at 746, 94 S.Ct. at 3128). Finally, district courts are to "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken II,* 433 U.S. at 281, 97 S.Ct. at 2757.

■ These principles, expounded in the main in school desegregation cases, are fully applicable in cases in which prison conditions are found to constitute cruel and unusual punishment.[18] In the prison context, therefore, district court judges must identify the conditions which, either alone or taken together, violate the Constitution; that being done, the remedial task is to correct those conditions to bring the prison as a whole within constitutional strictures.

But in carrying out their remedial task, courts are not to be in the business of running prisons. The cases make it plain that questions of prison administration are to be left to the discretion of prison administrators. *See Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400–01, 69 L.Ed.2d 59 (1981); *Cody v. Hillard, supra.* Thus it is that the Supreme Court has admonished the lower courts to be mindful that " '[local] authorities have the *primary* responsibility for elucidating, assessing, and solving,' " *Milliken II,* 433 U.S. at 281,

---

**18.** The Supreme Court has indicated that its statements in school desegregation cases as to the appropriate nature and scope of equitable remedies are fully applicable to Eighth Amendment prison litigation. *See Hutto v. Finney,* 437 U.S. 678, 687 n. 9, 98 S.Ct. 2565, 2572 n. 9, 57 L.Ed.2d 522 (1978) (discussing *Milliken II* and *Swann v. Charlotte-Mecklenberg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), as applicable to Eighth Amendment case).

97 S.Ct. at 2757 (quoting *Brown v. Bd. of Educ.*, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)), the problems that inevitably arise in the process of ensuring full compliance with the Constitution's demands. If, however, " '[local] authorities fail in their affirmative obligations ... judicial authority may be invoked.' " *Milliken II*, 433 U.S. at 281, 97 S.Ct. at 2757 (quoting *Swann*, 402 U.S. at 15, 91 S.Ct. at 1276). Only at this point—after local authorities have been found wanting at the remedial stage—has the Court emphasized the breadth and flexibility of the district courts' equitable power. *See Swann*, 402 U.S. at 15, 91 S.Ct. at 1276; *Milliken II*, 433 U.S. at 281, 97 S.Ct. at 2757.

That the Supreme Court understands the equitable discretion of district courts to be at its zenith *after* prison authorities have abdicated their remedial responsibilities was made clear in *Hutto v. Finney, supra*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522. In that case, the Court approved as within a district court's equitable power the imposition of a far-reaching and highly intrusive remedy; a significant factor in the Court's approbation of such sweeping remedial action was the long history of the litigation and the continued failure of the prison officials to bring about compliance with earlier, less intrusive orders. In upholding the lower court's action, the Supreme Court stated:

> In fashioning a remedy, the District Court had ample authority to go beyond earlier orders.... The District Court had given the [prison authorities] repeated opportunities to remedy the cruel and unusual conditions in the isolation cells. If [the authorities] had fully complied with the court's earlier orders, the present [stringent remedy] might well have been unnecessary. But taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to in-

sure against the risk of inadequate compliance.

*Id.*, 437 U.S. at 687, 98 S.Ct. at 2572.[19]

### B

■ Measured against these fundamental principles, we are constrained to conclude that the District Court's remedial order is misguided. After setting forth a variety of "deficiencies," the District Court stated broadly, "[t]he conditions at Occoquan ... cry out for a population limit." 650 F.Supp. at 630–31. The court imposed as its remedy a population limit, based on a formula to guarantee each prisoner 95 square feet of living space.[20] The court explicitly listed the maximum number of prisoners it would allow the District of Columbia to house in each dormitory at Occoquan.

The District Court did not hold that overcrowding at Occoquan offended the Eighth Amendment, Rather, it repeatedly observed that overcrowding *exacerbated* the effects of numerous deficiencies, which taken together, violated the Constitution. As we indicated before, an approach commensurate with Supreme Court precedent would have sought to identify the conditions causing the constitutional violation and order those conditions remedied. The District Court's power, it bears repeating, was to bring the prison into compliance with the Constitution; the court was powerless to seek to make Occoquan a "better place" or to bring it within "sound penological practices."

In our view, immediate resort to a population cap was much too blunt an instrument in view of the court's specific findings of "deficiencies" which the District of Columbia was ordered to correct (and which, the District maintains, have indeed since been corrected, *see supra* n. 17). This is especially so because a population limit, or put another way, a minimum square footage requirement, directly implicates deci-

---

**19.** *Cf. Swann*, 402 U.S. at 16, 91 S.Ct. at 1276 (*"In default by the school authorities of their obligation to proffer acceptable remedies,* a district court has broad power to fashion a remedy that will assure a unitary school system") (emphasis added).

**20.** The court chose the 95 square feet figure on the basis of professional standards. *See supra* p. 829 & n. 2.

sions with which the political process is charged. Such fundamental decisions as how many prisons to build and how large to build them—basic decisions regarding the allocation of public resources—are simply outside the domain of federal courts.[21] Indeed, it would have been difficult for the District Court to fashion a remedy that more fundamentally implicates the tensions between the prerogatives of local authorities and the demands of the Constitution.

Our reading of the Supreme Court's teachings in *Swann, Milliken I, Milliken II,* and *Hutto v. Finney* reinforces our conclusion that the remedy here swept too broadly. In those cases, the Court uniformly held that the scope of constitutional violations determines the scope of constitutional remedies, and that the equitable powers of the federal courts are at their broadest only after state officials default in their obligation to remedy constitutional wrongs. Thus, it will not do mechanically to invoke the talisman of "broad equitable discretion" as the basis for demanding that the District of Columbia either build more prisons or let convicted prisoners go free. In our view, counsel for the District put it aptly at oral argument when he characterized the choice of a population limit at Occoquan as "a last resort remedy as a first step."[22]

## IV

Our dissenting colleague's thoughtful and careful opinion joins well the issues presented by this important case. Our disagreements are, nonetheless, fundamental.

They are, reduced to essentials, twofold. First, our colleague reads the District Court's opinion rather differently than we do. As we have elaborated at some length, the District Court, in our view, fell into grave error by its continuous resort to the standards articulated by professional agencies in evaluating the constitutionality of the conditions at Occoquan. In addition, the court enumerated a considerable variety of "deficiencies" to condemn the entire panoply of prison conditions, rather than scrutinizing specific dormitories or services found to fall short of the constitutional minima. This, we believe for reasons already stated, is incompatible with the Supreme Court-mandated duty to focus with care on the specific circumstances said to occasion the Eighth Amendment violation. We acknowledge that opinions from other courts may point in different directions, but we believe that our colleagues in the Eighth Circuit sitting *en banc* have arrived at the proper approach to guide our analysis.

Our parting of the ways is equally fundamental with respect to our respective visions of the nature and scope of judicial power. Our colleague reads the judicial literature to give the courts broad power to fashion sweeping remedies to correct identified constitutional violations. There can be no doubt that the literature indeed contains language supporting precisely that broad vision, summoning up the historic image of the chancellor taking whatever steps in his broad discretion seem appropriate to rectify the situation found tainted with illegality. But it scarcely needs to be

21. This is so absent a showing of a complete abdication of the District's responsibility to remedy ongoing constitutional violations. *See supra* pp. 841–842.

22. Plaintiffs defend the District Court's order on the ground that it was necessary to ensure that conditions at Occoquan do not in the future once again become cruel and unusual. Citing *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982), *modified on other grounds,* 688 F.2d 266 (5th Cir.), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983), they argue that the equitable discretion of the district court allows it to "command[ ] measures that safeguard against recurrence" of the constitutional violation. 679 F.2d at 1155–56. But that duty cannot over-

whelm the obligation of the lower courts to craft equitable remedies with sensitivity and care; it certainly does not warrant the imposition of a last resort remedy as an initial remedial step. We thus do not hold today that use of a population cap as a remedy is per se impermissible.

Our dissenting colleague claims that the population cap is an appropriate remedy because all of Occoquan's problems ultimately stem from overcrowding. It bears repeating that, on the record before us, the population cap is an unnecessarily intrusive remedy inasmuch as the constitutional violations, if any there were, could have been corrected by other means. We do not understand the dissent to say otherwise.

said that the lawsuit before us is no ordinary suit in equity. In this setting of institutional conditions litigation, courts must, as the Supreme Court has said time and again, craft remedies with extraordinary sensitivity. Here, courts work in an arena that represents a crossroads where the local political branches of government meet the Article III branch and the higher commands of the Constitution. Those expressions of concern, of restraint, mean something quite clear to us. It is, upon analysis, an attitude of respect for and consideration of the extreme difficulties confronting the political branches whose charge it is to make the policy decisions eventuating in the construction and operation of the Nation's prison systems. It also means that we will not be quick to presume that the two other branches will cavalierly succumb to engaging in what the lower courts have been, at times, rather quick to condemn as *systemic* constitutional violations.

And it is but another dimension of the Supreme Court-mandated attitude of respect and consideration, albeit emphatically not to degenerate into judicial enervation and abdication, that the Court has impressed upon the lower tribunals in emphasizing the need narrowly to tailor the remedy to fit the violation. Rhetoric aside, that fundamental teaching, we believe, is at the core of the Supreme Court's message to the inferior federal courts over the last decades. That core message, to put it simply, trumps the broad rhetoric that our colleague understandably features.

## V

Accordingly, we conclude that the clear holdings of the Supreme Court require us to vacate the District Court's order imposing as it does a population limit at Occoquan generally and in each dormitory individually. In the circumstances of this case,

the District Court acted beyond its equitable powers.

For the foregoing reasons, the judgment is vacated and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

HAROLD H. GREENE, District Judge, dissenting:

In my view, the district court correctly found that the inmates of the Occoquan correctional facility have been subjected to cruel and unusual punishment. I also believe that the court acted within its discretion in imposing the remedy of a population ceiling. Accordingly, I respectfully dissent.

## I

The majority has fairly and comprehensively summarized the findings of the district court. However, for a full understanding of the reasons for my belief that the lower court was justified in concluding that the conditions at the Occoquan facility violate the Eighth Amendment, a brief recapitulation of the central findings and the evidence in support thereof is in order.

The Occoquan prison complex is seriously overcrowded; that overcrowding has grown progressively worse; and it is inevitable that Occoquan will continue to show a stifling increase in inmate population. The original capacity of the institution was 1,366, but by March of 1988 the inmate population had already risen by almost 700, to 2,051.

Because of increases in crime, particularly in drug trafficking and in such violent offenses as homicide, and the enactment of several mandatory minimum sentence laws,[1] the number of convicted criminals sentenced to imprisonment in the District of Columbia is constantly rising.[2] These

---

1. *See, e.g.,* D.C.Code § 22–3202(a) (mandatory minimum for crimes of violence while armed); D.C.Code § 33–401 *et seq.* (mandatory minimum for drug-related crimes).

2. The Interim Report of the Special Officer appointed by the district court to monitor compliance submitted on June 19, 1987, attests to the

magnitude of the problem. In the five months between January 1, 1987 and June 1, 1987, there was a net population increase in all the District of Columbia institutions of 981 inmates, an average of almost 200 inmates per month. The Special Officer projected an increase of 2,400 inmates in 1987 alone.

developments are placing substantial pressure on the Department of Corrections to find room for the added convict population. However, the correctional institutions operated by that Department other than Occoquan that could be used for adult medium security inmates are all under population caps imposed by consent decrees.[3] With the decision of this Court to reject the remedy of a population ceiling for Occoquan, that facility will be the only one where additional medium security inmates could hereafter be confined, and the overcrowding is therefore bound to increase further.

Numbers do not tell the entire story, however. The trial evidence showed that the beds in the dormitories at Occoquan are virtually jammed against each other, allowing not only no privacy but precluding even the opportunity for more than the most minimal movement.[4] Several of these dormitories are hastily-converted warehouses;[5] one is a basement converted in a single day to the housing of inmates; and several are located close to a coal pile that gives off acrid fumes. The warden has been quoted as stating that conditions in one of the dormitories were "extremely poor, and [it] should not be used for housing." A. 58. Various experts who viewed and inspected the institution characterized the overcrowding in terms that could leave

no doubt of their dismay at what they found.

One such expert (Dr. Frank Rundle) described one of the housing units as being in "a half ground level location ... dark, very few windows, without good ventilation, and extremely crowded. The bunks were double and spaced very close together. The atmosphere was of intense density of people." A. 82–83. Another expert (Eugene Miller, former administrator in the District of Columbia Department of Corrections) talked of "oppressive physical conditions [that were] extant at that time. I think, bluntly, I really didn't see how people could, at that point, justify housing people in those kinds of conditions." A. 64–65.[6]

One of the consequences of the overcrowding and the poor hygienic conditions is a serious risk of widespread disease, including tuberculosis.[7] Yet by even the most relaxed standard, the level of medical services at the Occoquan institution can only be described as deplorable. Because of the increased population, sick call had to be reduced from five days a week to three; technical assistants perform medical diagnoses; prisoners are not screened at the D.C. Jail for syphilis and tuberculosis even though between ten and twenty percent of these prisoners may be expected to test positive for these diseases; there are significant delays in transferring inmates' medical records from the D.C. Jail;[8] pris-

3. The only exception is the Modular Facility, but it is itself overcrowded by over fifty percent (627 inmates in an institution with a capacity of 400). See note 46, infra.

4. According to the testimony, the inmates have virtually no place to put their clothes or other personal property.

5. Occoquan must be one of the few correctional institutions in existence where prisoners are warehoused in the literal sense of that term.

6. Mr. Miller went on to say that one of the dormitories "was basically a pit, if one wants to get into it. As you know, about the only ventilation coming into this bloody thing is through the door which is left open into this kind of dusty area, with the coal and everything else on the other side." A. 64–65. Kathryn Monaco, a District of Columbia consultant for correctional affairs, also recalled that "[t]here were noxious fumes in the air [from] the coal pile. It was blowing in...." A. 68a.

Ward Duel, an expert on environmental safety and health matters, described the distances between the beds as "very unsatisfactory" and Occoquan as "overcrowded" even at its then level of 1,500 inmates—over 130 fewer than when the district court made its decision. A. 101.

7. The district court found that the confinement of excessive numbers of people in limited spaces increases the risk of transmission of airborne diseases, and that this health risk is further heightened by the inadequate and sometimes nonoperational ventilation system, the lack of screens on windows, the resulting fly infestation, and the soiled, torn, dirty, and damaged mattresses which harbor disease-carrying insects such as mites, fleas, ticks, and lice. A. 2–3.

8. Two inmates had been diagnosed at the D.C. Jail as having AIDS, but the medical records were substantially delayed in being transferred to Occoquan, and the condition of the inmates was therefore unknown when they were assigned dormitory space.

oners must wait excessive periods of time to arrange for needed visits to surgery, neurology, and orthopedic clinics;[9] and there is no medical coverage at all during the midnight shift.

With respect to mental health and psychiatric staffing, Dr. Claybourne, a staff psychologist, stated that they "had a dreadful, dreadful disproportionate number of staff psychologists" and that "[i]n reference to population, we can't do it—one man can't do it all." A. 79–80.[10] Indeed, the prison psychiatrist was able to see each patient for only about seven minutes, even for evaluation purposes—a period that the district court, in what may be an understatement, described as "simply impossible." A. 12.

These conditions have led, quite naturally, to a pervasive climate of violence. The precise number of serious assaults in the year preceding the trial cannot be ascertained with accuracy since the figures of the Department of Corrections are plainly incorrect;[11] however, it is clear that the number is very high.

Many of the assaults may be attributed to the fact that, on account of the overcrowding, the number of correctional officers is insufficient adequately to supervise the inmates' sleeping areas. Moreover, because of the overcrowding at the other Lorton institutions, maximum security inmates are housed at Occoquan in open dormitories with the general population of inmates properly assigned to that facility. Finally, it should be noted in regard to the climate of tension and violence that the instant lawsuit was filed in response to, and shortly after, a riot in the course of which one inmate was killed, eighteen inmates and nine guards were injured, and eight dormitories were damaged by fire.

On this basis,[12] even the District of Columbia's own experts concluded that conditions at Occoquan, particularly the overcrowding, were both deplorable and explosive.[13]

9. One inmate was referred to a surgery clinic for consultation in June 1986, and he had not yet been seen there in October of that year. Waiting periods of from three to six months are common for the neurology clinic and one to two months for the orthopedic clinic.

10. Dr. Claybourne referred, among other examples, to a group of Vietnam veterans who were seriously mentally ill and had flashbacks that should have been but were not treated; street people whose inattention to bathing, grooming, and the like made them problems within Occoquan's "tightly packed population"; and a group of prisoners confined for sexual cause who needed treatment if they were to maintain psychological equilibrium. A. 80–81.

11. The District of Columbia listed forty such assaults, but the true number is undoubtedly far higher than that, for the District's compilation simply omits many additional violent incidents. Among assaults not listed by the appellants that appellees just happened to know about were a stabbing on an inmate by other inmates wearing ski masks; an assault on an inmate by several prisoners with a pipe; two other assaults with pipes; repeated sexual assaults on a youthful prisoner; a prisoner who was bludgeoned while he slept; and another inmate who was stabbed in the chest while he was in the bathroom. The district court found that "the level of violence at Occoquan is significantly greater than defendants' statistics reflect." A. 6.

12. As the majority notes, Maj.Op. at 829–34, the district court also made findings regarding serious inadequacies in food services, inmate classification and programs, noise levels, segregation, inmate supervision, and fire safety. Not all of these are of course of equal importance, but all of them contributed to the overall conditions at the institution.

13. The District of Columbia's special consultant for correctional affairs wrote in June 1986:

[I]nmates are crowded into dormitories with little or no chance for privacy, causing a great deal of tension with the result that normal prison management difficulties are compounded. In case of fire or serious emergency, it would be next to impossible to evacuate these dormitories effectively. In dormitories J–1 and J–2, which are converted warehouses, the overcrowding is so serious that it is reasonable to expect some major disturbance in the near future. The noise level in these dormitories exceeded any reasonable limits, and it was necessary to almost shout to be heard. Bunks were so closely packed together that there was only a minimal amount of space between them. There was no ventilation. The door to the outside of the dormitory was open for air, but there was no screen and dust from the outside recreation area and fumes from a nearby stack of coal blew into the dormitory. The dayroom space, or area where the inmates could engage in games and other activities, was extremely limited. Therefore, a large number of inmates were left with no means of activity, and no place to congregate except on their bunks. The cumu-

## II

It cannot seriously be suggested, and appellants do not contend, that the factual findings that underlie the district court's conclusions are not supported by the evidence. Appellants do argue, however, that the court below erred by "uniformly ... [judging] the adequacy of the inmate conditions by reference to published standards recommended by various organizations or by the inmates' experts." Br. at 12. The majority likewise faults the district court for relying on standards promulgated by various professional organizations and experts, Maj.Op. at 836–37, 839, citing *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

It is true, of course, that under *Rhodes* a deprivation of Eighth Amendment rights in prison cases may not stand or fall upon the opinions of experts. However, *Rhodes* does not hold that expert or professional opinions are not relevant in such cases. On the contrary; the Court stated that the opinions of experts as to appropriate prison conditions would not "suffice" to establish contemporary standards of decency, 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13, plainly implying that such opinions may be taken into account, with other evidence, in determining the proper standards and their possible violation.

Indeed, professionally formulated standards are the most objective tools available for this purpose.[14] *French v. Owens*, 777 F.2d 1250 (7th Cir.1985), *affirming,* 538 F.Supp. 910 (S.D.Ind.1982); *Ramos v. Lamm,* 639 F.2d 559, 567 n. 10 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *see also* Justice Brennan's concurring opinion in *Rhodes, supra,* 452 U.S. at 356, 101 S.Ct. at 2404.

The majority holds, quite properly, that the courts are to search for objective factors to guide constitutional analysis, as distinguished from "the peculiar views of individual trial judges." Maj.Op. at 836.[15] Yet if the subjective perceptions of individual judges are ruled out as establishing the proper standards, only the studies, criteria, and standards of professional organizations [16] and other experts remain, as a practical matter, to be used for that purpose. If this tool, too, were to be rejected, an Eighth Amendment analysis of prison conditions could be rendered altogether impossible.[17]

In any event, the district court did not rely solely, or even primarily, upon the opinions of experts when determining whether proper standards were violated.[18] With respect to every category of life at the Occoquan facility that it found to be below acceptable norms, the court made explicit findings based upon conditions at Occoquan on evidence adduced at the trial.

For example, while the court noted that the American Public Health Association sets out a standard of 95 square feet of

lative impression is of a very hectic environment that is extremely tense and dangerous. A. 21–22.

14. While expert formulations obviously do not by themselves supply the appropriate constitutional standard, they do lend assistance to a trial judge who wishes to refrain from relying entirely or at all on his own subjective views regarding the necessarily intangible issue of what are civilized standards in a prison setting.

15. However, as the Supreme Court said in *Rhodes, supra,* "in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. 452 U.S. at 346, 101 S.Ct. at 2399.

16. Appellants' disparagement of the organizations cited by the court below neglects to consider the impeccable professional credentials of these organizations. For example, the American Correctional Association is the premier organization of prison administrators and penologists in this country, if not the world, and it is not noted for exalting the rights of inmates over those of correctional authorities and the public.

17. Notwithstanding the majority's strong endorsement of legislative and executive decision-making with respect to this subject (Maj.Op. at 835–36), there is no suggestion that, in performing their Eighth Amendment function, the courts should invariably accept as valid the product of that decision-making and decline ever to differ from it.

18. Several of the experts on which the district court relied did not simply render academic judgments; they visited the Occoquan facility and familiarized themselves with the conditions there.

space per inmate, and that this objective was not met at the Occoquan facility,[19] it also found specifically that "beds are but seven to nine inches apart"; that on account of the confinement of excessive numbers of people in limited spaces, the risk of airborne diseases is greatly increased; and it considered trial exhibits that provided graphic evidence of the cramped quarters in which inmates spend the bulk of their hours. *See* A. 3, and plaintiff's exhibits at A. 107–117.

Similarly, although there was expert testimony that noise levels in the dormitories often exceeded the American Correctional Association standard, the court found that the noise was excessive on the basis of the more specific testimony that it was "necessary to almost shout to be heard" inside the dormitories, A. 22, and that "it was extremely difficult ... to hold any kind of conversation in what might be termed a normal tone of voice." A. 53. And general sanitation conditions were found to be lacking, not because they were below acceptable environmental standards, but because window screens were torn, promoting fly infestation; mattresses were torn and soiled, and other specific deprivations existed.

In sum, appellants' contention that the district court's findings are subject to reversal because they were improperly based upon expert opinion flies in the face of the record.

### III

I fully agree with the majority's conclusion that *Rhodes v. Chapman, supra,* sets forth the framework for analysis of Eighth Amendment challenges in prison settings. The issue, then, is whether, given the factual record summarized above, appellees demonstrated that the conditions of their confinement violated the requirements of that constitutional provision. Appellants' argument, which the majority largely endorses, proceeds on several levels.

Appellants argue initially that, although there may have been proof of particular deprivations, each such denial does not, by itself, amount to cruel and unusual punishment, and that it was error for the court to aggregate the various problems to measure them in combination against the Eighth Amendment standard. The majority appears at times to agree with that contention, Maj.Op. at 834, 838, 842–43,[20] while at other times it endorses a "totality of the circumstances" approach. Maj.Op. at 839.

It is well established that a court is not reduced to weighing each of the institutional practices and conditions in isolation, but that, in order to determine whether serious deprivations of human needs exist, it may examine the totality of the conditions of confinement. *Alberti v. Klevenhagen,* 790 F.2d 1220, 1224 (5th Cir.1986); *French v. Owens, supra,* 777 F.2d at 1252; *Ruiz v. Estelle,* 679 F.2d 1115, 1139 (5th Cir.1982), *modified on other grounds,* 688 F.2d 266, *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir.1981); *Villanueva v. George,* 659 F.2d 851, 854 (8th Cir.1981) (en banc). Indeed, the Court said in *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399, that prison conditions *"alone or in combination,* may deprive inmates of the minimal civilized measure of life's necessities" (emphasis added).

More seriously, the majority appears to read *Rhodes* as concluding that only the most critical denials of essential food, medical care, sanitation, and physical safety constitute the kind of deprivations of essen-

---

**19.** The 95 square feet measurement includes all space; on the basis of sleeping space alone, 60 square feet are available per inmate. Interestingly, these space requirements, which appellants vigorously challenge in this case, are identical to those to which they agreed in the consent decrees applicable to the other District of Columbia correctional facilities.

Various cases cited by appellants in which courts approved less space than that (*e.g., Nel-* *son v. Collins,* 659 F.2d 420, 428 (4th Cir.1981) (en banc); *Campbell v. Cauthron,* 623 F.2d 503, 507–08 (8th Cir.1980)), involved short-term prisoner stays—one week to 120 days—not inmates serving lengthy sentences.

**20.** The majority also remands for consideration of each aspect of prison life separately. Maj.Op. at 839.

tial human needs that are protected by the Eighth Amendment. Maj.Op. at 836. As indicated above, the record in this case demonstrates at least some such deprivations.[21]

Moreover, far from establishing a narrow, compartmentalized category of unlawful correctional practices, the Court said in *Rhodes* that the words "cruel and unusual" should be interpreted "in a flexible and dynamic manner;" that no static test exists to determine whether conditions of confinement are cruel and unusual, *citing Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976); that "the Amendment's reach [has been extended] beyond the barbarous physical punishments at issue in the Court's earliest cases;" and that the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. 452 U.S. at 345–47, 101 S.Ct. at 2398–2400.[22] And the Court concluded that conditions "other than those in *Gamble*[23] [medical care] and *Hutto*[24] [deprivations of basic human needs] ... may deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399.[25]

Beyond that, even though the Supreme Court in *Rhodes* clearly intended to establish broad guidelines, the statements from the *Rhodes* opinion relied upon by the majority cannot be entirely divorced from the factual record before the Supreme Court in that case. *Rhodes* involved directly only a single question—"whether the housing of two inmates in a single cell ... is cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments." 452 U.S. at 339, 101 S.Ct. at 2395. Except for the double-celling, the Ohio correctional facility at issue in *Rhodes*, far from being a substandard, dangerous institution, had gymnasiums, workshops, schoolrooms, dayrooms, two chapels, a hospital ward, commissary, barbershop, recreation field, garden, and a "modern, well-lit" library containing 25,000 volumes, "superior in quality and quantity." The classrooms were likewise "light, airy, and well equipped." In an assessment which the parties and the Supreme Court accepted as accurate, the district court in the *Rhodes* case described the physical plant of the institution as "*unquestionably a top-flight, first-class facility.*" 452 U.S. at 340–41, 101 S.Ct. at 2396 (emphasis added). No one, not even the appellants, would so characterize the Occoquan facility.

Not only, then, was the Supreme Court in *Rhodes* confronted with a factual setting radically different from that before this Court here, but it does not appear that the High Court intended that judicial concerns be limited to the most outlandish or barbaric. As the concurring opinions in *Rhodes* noted, the holding in that case "should in no way be construed as a retreat from careful judicial scrutiny of prison conditions," 452 U.S. at 353, 101 S.Ct. at 2402 (Brennan, J., concurring), and that it would be erroneous to regard the opinion as "a signal to prison administrators that the federal courts now are to adopt a policy of general deference to such administrators

---

21. The majority finds fault with the district court's conclusions because that court used the term "deficiencies" in describing various conditions at Occoquan. *E.g.,* Maj.Op. at 835–37. But it is clear from the lower court opinion as a whole, in particular the references to *Rhodes; Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), and other cases, that the court was concerned with violations of "contemporary standards of decency" (*see, e.g.,* A. 14, 15), and that, when it used the word "deficiency" it was as shorthand for constitutional violations or deprivations.

22. Indeed, the deliberate indifference to an inmate's medical needs is "cruel and unusual punishment because an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 452 U.S. at 347, 101 S.Ct. at 2399. This holding presumably applies to other inmate needs which he cannot provide for himself.

23. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

24. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

25. Needless to say, convicted criminals are not entitled to country club living; conditions of imprisonment that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society. *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399.

and to state legislators," 452 U.S. at 369, 101 S.Ct. at 2411, (Blackmun, J., concurring).

## IV

The majority emphasizes, as did the Supreme Court in *Rhodes* and in *Bell v. Wolfish*, 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979), that the operation of correctional facilities is peculiarly the province of the legislative and executive branches, not the judicial. I not only accept the Supreme Court's admonition—as of course I must—but I also agree with it. The operation of a correctional institution, and particularly its internal security—the aspect of prison life emphasized in *Rhodes*, 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14—is not only complex and requires training and experience, but it is also important from a disciplinary point of view that there be as little outside interference as possible, including interference by the judiciary.

Yet sight must not be lost of the fact the issues before the Court involve a provision of the Bill of Rights. When construing and applying the Eighth Amendment, the courts are not seeking to intrude into subjects that have traditionally been reserved to the political branches; they are performing one of their own core functions.

The legislative and executive branches are under enormous political pressures. On the one hand, they are expected, particularly in urban areas such as the District of Columbia, to wage an effective war on crime, especially violent crime, a war that realistically must involve the imprisonment, following trial and sentence, of substantial numbers of criminals. On the other hand, the public by and large fiercely resists raising the tax monies required for the construction and operation of the institutions necessary to house these convicted criminals.

Thus, left to their own devices, the legislative and executive branches will quite naturally opt for incarcerating increasing

numbers of persons in whatever space can be found in existing institutions, even if that should result in conditions which are violative of Eighth Amendment rights.[26] If the Bill of Rights prohibition against the imposition of cruel and unusual punishment in the correctional setting is to have meaning, therefore, the enforcement of the constitutional standards—as in other contexts where powerless or unpopular segments of the population require constitutional protection, *e.g.*, as in some First Amendment situations—can be supplied only by the courts.[27] It is on this basis that Justice Brennan, concurring in *Rhodes*, noted that "[u]nder these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions ... [i]nsulated as they are from political pressures...." 452 U.S. at 359, 101 S.Ct. at 2405–06. In my view, we would be less than faithful to the command of the Eighth Amendment if we did not approach our task with these considerations in mind.

For the reasons discussed above, I am of the opinion that the district court's factual determinations regarding violations of the Eighth Amendment are supported by the evidence, and that its legal determinations with respect thereto are correct. What remains to be discussed is whether the court exceeded its authority in deciding to impose a population ceiling on the Occoquan facility as a remedy for the violations it had found.

## V

The majority holds that the district court's remedial order is misguided in that, contrary to law, it imposed a population cap to rectify deficiencies in specific areas, such as medical care, sanitation, and inmate security. With respect, I disagree with that conclusion, both on the law and on the facts.

The decisions are legion holding that, once a court has found a constitutional

---

**26.** This is not meant as a criticism of officials from the legislative and executive branches. Most of them are undoubtedly doing the best they can given the strong, conflicting pressures.

**27.** *Cf. Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country").

violation, "the scope of [its] equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). The majority relies to the contrary primarily upon the *Milliken* cases,[28] upon *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), and upon principles expounded, as the majority sees it, in the school desegregation cases, particularly *Swann* and *Brown v. Board of Education,* 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955).

As I read the *Milliken* decisions, they support rather than detract from the exercise of equitable power by the district court in this case. These decisions involved school desegregation problems in the Detroit area. The district court ordered the adoption of desegregation plans extending beyond the boundaries of the city of Detroit, to include also the suburban schools. In *Milliken I,* the Supreme Court held that it was error to depart from traditional decisions which required the consideration of violations and the adoption of remedies limited to a single school district. It is in that context that the Court made the statement, relied upon by the majority here, that the scope of the remedy is determined by the nature and extent of the constitutional violation. Maj.Op. at 841.

The meaning of that admonition was expanded and clarified in *Milliken II.* There the Court, speaking as in *Milliken I* through Chief Justice Burger, upheld compensatory education programs as part of a desegregation plan against the State's claim, said to be compelled by *Milliken I,* that, since the constitutional violation was the unlawful segregation of students on the basis of race, the court's decree had to be limited to remedying unlawful pupil assignments. 433 U.S. at 281, 97 S.Ct. at 2757–58. The Court squarely rejected that contention. After noting that "federal court-decrees exceed appropriate limits if they are aimed at eliminating a condition

that ... does not flow from a [constitutional] violation ..." the Court went on to explain that:

> ... where ... a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the condition that offends the Constitution.... [P]upil assignment alone does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by independent measures.

And the Court concluded by stating that:

> The District Court ... was true to the principle laid down in *Brown II:*
>
> > In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power.

433 U.S. 281–88, 97 S.Ct. at 2757–61.

The *Milliken* decisions thus not only confirm the breadth of the equitable power possessed by the district courts; they explicitly hold that a decree is within the ambit of that power if it addresses and relates to the violation or eliminates a condition that flows from that violation. That is the remedy fashioned by the decree in this case. *See* p. 853, *infra.*

In *Hutto v. Finney, supra,* the Supreme Court upheld a series of far-reaching orders to remedy prison conditions in the Arkansas penal system. One of the reasons given by the Court for approving the injunctions, among several others, was that the lower court had given the correctional authorities repeated opportunities to remedy the cruel and unusual conditions. *See* Maj.Op. at 841, 842–43. But there is no basis for concluding, either from *Hutto* or from equity principles generally, that

---

**28.** *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*); Mil-

liken *v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*).

the courts may exercise their power [29] to impose equitable remedies only after local authorities have been found wanting at the remedial stage at least once.[30]

Indeed, in *Swann, supra,* the Supreme Court said unequivocally that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad ...," 402 U.S. at 15, 91 S.Ct. at 1276, and there is nothing in the *Swann* opinion to suggest that equitable remedies are lawful only if the violator has been afforded prior opportunities to rectify the wrong.[31]

As for the school desegregation cases, they cannot, in my view, be relied upon at all to support a restrictive view of equitable authority. As already noted, the *Swann* Court was effusive in reaffirming the broad powers of the district courts to fashion equitable remedies, especially where past wrongs need repairing. As for the *Brown* decision, it has generated so many wide-ranging remedial orders in so many circuits, districts, and states affecting thousands of school districts and millions of children all across the land, that I think it is impossible to regard that decision as setting tight limitations on the remedial authority of the courts.

The experience with remedial orders in prison litigation is similar. Population ceilings have been imposed in a number of cases. Thus, in *Ruiz v. Estelle, supra,* this Court of Appeals for the Fifth Circuit, in an exhaustive opinion, held, *inter alia,* that the district court was justified in concluding that the overcrowding involved in that case exercised a malignant effect on all aspects of inmate life; that overcrowding, combined with the relatively small number of guards, resulted in a constant threat to the inmates' personal safety; and that a court-imposed population cap was largely valid and justified.[32] Broad remedial orders are also reflected in decisions of the Sixth Circuit (*French v. Owens,* 777 F.2d 1250, 1253 (6th Cir.1985), *affirming,* 538 F.Supp. 910, 927 (S.D.Ind.1982)); the Seventh Circuit (*Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983)); the Fourth Circuit (*Johnson v. Levine,* 588 F.2d 1378, 1381 (4th Cir.1978)); the Fifth Circuit (*Williams v. Edwards,* 547 F.2d 1206, 1214–15 (5th Cir.1977)); the Tenth Circuit (*Battle v. Anderson,* 564 F.2d 388, 403 (10th Cir.1977)); [33] and a number of district courts.[34] Justice Brennan's concurrence in *Rhodes* counted twenty-four State prisons or prison systems that were placed under

---

**29.** Only the question of power is at issue; obviously as a matter of discretion a court would be well advised to afford local governmental authorities ample opportunity to rectify violations on their own before judicial coercion comes into play.

**30.** In Eighth Amendment constitutional adjudication there does not seem to be any equivalent to the old common law maxim that a dog is entitled to one free bite. *See Chandler v. Vaccaro,* 167 Cal.App.2d 786, 334 P.2d 998 (1959); *Zarek v. Fredericks,* 49 F.Supp. 65 (M.D.Pa. 1943), *aff'd,* 138 F.2d 689 (3d Cir.1943).

**31.** In any event, even if the majority's view of the law is correct—that is, if the courts may exercise their equitable powers only after particular defendants had already previously been found wanting in their compliance—that condition is amply funfilled here. Injunctions, decrees, and other orders, even contempt citations, have been issued against the District of Columbia correctional authorities again and again for a number of years, without any appreciable results. *See* pp. 853–55, *infra.*

**32.** The Court of Appeals declined to endorse some measures directed at the 33,000–inmate

Texas Correctional System, at least for a time, as too costly and irreversible. 679 F.2d at 1148.

**33.** *Cody v. Hillard,* 830 F.2d 912 (8th Cir.1977), is of course to the contrary. However, even at that, this case and that are not on all fours. The court found in *Cody* that elimination of the double-celling—the principal basis for complaint—would not have alleviated the problems raised on behalf of the inmates (unsanitary practices, substandard electrical wiring, and other hazards) to any perceptible degree. *Id.* at 914. Not so here; overcrowding is a substantial source of the problems in this case, and if there were fewer inmates at Occoquan, most of the objectionable conditions would be improved since the facilities and services are sufficient for a smaller prison population.

**34.** *See, e.g., McMurry v. Phelps,* 533 F.Supp. 742, 775 (W.D.La.1982); *Palmigiano v. Garrahy,* 443 F.Supp. 956, 987 (R.I.1977); *Costello v. Wainright,* 397 F.Supp. 20, 34 (M.D.Fla.1975), *vacated on other grounds,* 539 F.2d 547 (5th Cir.1976), *remanded,* 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed. 2d 372 (1977).

court order because of the conditions of confinement. 452 U.S. at 353 n. 1, 101 S.Ct. at 2402–03 n. 1. The district court's remedy in the instant case is thus well within the mainstream of the law.

On the facts, too, a population cap is appropriate in the present situation. This is not a case where there is a deficiency in one isolated aspect of prison life, *e.g.*, poor food or inadequate fire protection. Where that is the problem, a court would be abusing its discretion if it attempted to remedy the defect by a population cap. But here we are dealing with a situation that is radically different. The various problems existing at Occoquan, especially the more serious ones of inadequate space, oppressive atmosphere leading to violence, poor hygienic conditions, and poor medical care, are not only all intertwined but they can all be traced to the presence of inmates in numbers far exceeding the facility's capacity.[35] It is presumably on this basis that even David Decatur, administrator of Occoquan I and II, and Frank Phillips, administrator of Occoquan III, expressed the view that a population cap was necessary.

## VI

In support of its conclusion that the appropriate solution to the situation at Occoquan is to remedy each of the problem areas rather than to impose a population ceiling, the majority relies in substantial part upon the representation of counsel for the District of Columbia at oral argument in this Court that the District "was keenly interested in correcting (and had corrected) conditions found unacceptable by the District Court." Maj.Op. at 840.[36] Acceptance of that statement as a basis for overriding the district court's exercise of equitable discretion represents a triumph of hope over experience.

It is relevant, I think, to recount here the sad history of promises made by the District of Columbia in regard to conditions in the correctional institutions under its jurisdiction and control. In *Campbell v. McGruder, supra,* this Court related the long record[37] of lack of compliance with court orders and of false assurances made to the courts by the Department of Corrections or the D.C. Corporation Counsel with respect to the D.C. Jail, as follows:

The District Court was assured that defendants would be in compliance with the 48 square foot requirement [at the D.C. Jail] by August 15, and that defendants would provide notice to the court should the space requirement again be

---

**35.** Many of the conditions cited by the district court as problematic were so only because of the large number of inmates who are forced to share a facility constructed with smaller population limits in mind. For example, food service was found to be inadequate because dry and cold food storage areas were filled beyond capacity, risking contamination of meats and produce. Were the population reduced to levels for which the kitchen was designed, this problem would disappear. Similarly, it was the increase in population at Occoquan that led to a reduction of formalized sick call from five days per week per dormitory to three days per week. Again, with fewer inmates to treat, available health personnel could properly attend to the entire population.

Other cited conditions are equally population dependent: for example, the classification system at Occoquan was found to be "dangerously overtaxed by the crush of inmates in need of classification." Clearly, overcrowded housing conditions would cease to be a concern under lower inmate population counts, and noise problems would be severely diminished. The threat of violence among the inmates would

also likely diminish, as "[e]xperience around the country demonstrates that overcrowding like that now existing at Occoquan I and II, which so severally [sic] inhibits any quality of life, results in violence." First Compliance Report for the D.C. Department of Corrections at A. 22.

**36.** Says the majority further, "[a]nd, crucially, the record is already stale. The District has represented to us that it has already addressed and remedied many (if not all) the specific 'deficiencies' enumerated by the trial court." Maj.Op. at 840. In a similar vein, the majority indicates that the district court's imposition of a population ceiling was a "last resort remedy [used] as a first step." Maj.Op. at 843.

**37.** Although the instant lawsuit began only in 1986, the D.C. Department of Corrections had even then been before the court since 1979 in cases challenging the conditions at the Lorton facilities, *see John Doe v. District of Columbia,* C.A. No. 79–1726 (maximum security facility); *Twelve John Does v. District of Columbia,* C.A. No. 80–2136 (Lorton central facility), and even longer in cases challenging the conditions at the D.C. Jail. *See Campbell v. McGruder, supra.*

violated ... On October 14, the court was notified by defendants' counsel that the Jail was no longer in compliance with the space requirement, and had been out of compliance since September 16....

On January 12, 1986, appellants advised the court that they were presently in compliance with the space requirement. However, on April 7, 1976, the District Court made an unannounced visit to the Jail, and ... found that '[d]uring most of the period from mid-January to mid-April, more than 200 persons at a time were held in violation of this Court's March 1975 order....' The defendants failed to provide 'prompt notice' of this overcrowding to the District Court.

... On November 5 and again on May 24, 1976, the District Court found not only that compliance was feasible, but that [apart from converting a dormitory] the Department and the city have made no substantial efforts to comply with the Order of this Court ... and there is no evidence of any contemplated effort to either reduce the population at the Jail or to provide additional space.

In this case, the district judge offered the following observations after five years of litigation:

... [T]he tedious history of this litigation reflects only occasional and sporadic efforts, usually when a court proceeding has been scheduled, following by almost total inactivity once the matter is no longer before the Court as a crisis situation.

580 F.2d 537–43 (footnotes omitted).[38]

*Morgan v. District of Columbia, supra,* handed down last year, suggests that little had changed in the nine years since the *Campbell* decision. Said the Court in *Morgan:*

Overcrowding has been a persistent, systemic problem in the District's prison facilities and has been the subject of continuous litigation for over fifteen years. The District built the Jail at which appellee Morgan was housed only after considerable prodding from the federal courts to ease the overcrowding problem in the old detention facility, in which conditions were notoriously appalling ... [I]n compliance with ... constitutional requirements ... the court established certain conditions on the use of double-celling with regard to pretrial detainees.... The District failed to take remedial action, and the inmate population continued to swell.... In September, the district court found that the District had deliberately failed to obey its orders concerning overcrowding at the Jail and held the District in civil contempt. *See Campbell v. McGruder,* C.A. No. 1462–71 (D.D.C. Sept. 30, 1983).

824 F.2d 1052–53.[39]

The record of promises made to the courts with respect to the Lorton facilities is similar. To date, more than three and one-half years after the consent decree governing the Lorton Central Facility was entered,[40] the Department has failed to renovate various cell blocks or to provide satisfactory mental health care, as agreed in

---

**38.** The Court went on to say (580 F.2d at 541):

[T]he District Court was fully justified in concluding that this case was not moot. As the Supreme Court has stated:

When defendants are shown to have settled into a continuing practice ... courts will not assume that it has been abandoned without clear proof. *Local 167 [of International Brotherhood of Teamsters] v. United States,* 291 U.S. 293, 298, 54 S.Ct. 396, 398, 78 L.Ed. 804. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.

**39.** *See also Campbell v. McGruder,* 416 F.Supp. 100 (D.D.C.1975); *Campbell v. McGruder,* 416 F.Supp. 106 (D.D.C.1975); *Campbell v. McGruder,* 416 F.Supp. 111 (D.D.C.1976); *Inmates v. Jackson,* 416 F.Supp. 119, 123 (D.D.C.1976).

**40.** The final settlement and consent decree in C.A. No. 79–1726 was entered on March 28, 1984. The lawsuits relating to the Maximum Security and the Central Facility are consolidated at the district court level with the instant case, and they are assigned and have been handled for years by the same judge who made the findings and entered the judgment herein, and who may therefore be deemed to be well familiar with the history recited above.

that decree.[41] The population caps imposed by the consent decree at the Central Facility have been violated since June 30, 1987.[42] In its report to the district court in this case, the District of Columbia asserts that, as to inadequate dormitory ventilation and general renovation, faulty wiring, and inadequate emergency lighting, bids for a contract to perform the work were opened October 15, 1987, ten months after the relevant order was entered.[43] Finally, although the Department stated in a recent report to the court that "efforts to fill [medical staff] positions [at Occoquan are] continuing ... [and that] [a]uthorization for additional positions has been approved," [44] this claim, too, must be taken with more than a grain of salt. Judge William Bryant, ruling three years ago in *Campbell v. McGruder, supra,* [45] noted:

... *five years ago we ordered defendants to hire additional medical staff. Campbell v. McGruder,* C.A. No. 1462–71, slip op. (D.D.C. June 9, 1980). Defendants now assert their inability to hire or retain qualified professionals. This is to be expected inasmuch as the conditions of employment that flow from overcrowding already overtaxed facilities are completely unattractive to professional employees (emphasis added).

In the face of this astounding record, there is no reason to believe that promises made and broken (and court orders ignored or violated) during a ten or twelve-year period will suddenly be kept merely because counsel in the course of an oral argument repeated these promises once again.

## VII

Occoquan does not represent a static situation. As discussed above, the number of inmates is constantly increasing—from 1,397 in October 1985 to 2,051 in March 1988. These increases are even more alarming when considered in the setting of the problems experienced by the District of Columbia correctional system as a whole. As noted, with the exception of the vastly overcrowded modular facility, all the institutions other than Occoquan available for Occoquan-type inmates are under population ceilings imposed by consent decrees as a consequence of various lawsuits.[46]

At the same time, as noted above, crime in the District keeps rising, and so does the number of criminal defendants sentenced to imprisonment, with the consequence that the total number of inmates for whom the Department of Corrections must find space rises by 200 every month. It does not take clairvoyance to predict that, with the population ceilings in place with respect to all other suitable District of Columbia penal facilities, and this Court's rejection of a population ceiling in this case,[47] the Occo-

---

**41.** Report of Special Officer of the Court; Plaintiffs' Motion for Finding of Contempt and Imposition of Sanctions.

**42.** Affidavit of Hallem H. Williams, Jr., on behalf of D.C. Department of Corrections, July 1987.

**43.** It is anyone's guess how long the award process will take and when the work will actually begin and be completed.

**44.** Defendants' December 10, 1987 Report to the Court, Attachment 2.

**45.** Slip opinion (D.D.C. July 15, 1985) at 5.

**46.** The District of Columbia Department of Corrections maintains eight adult institutional facilities, seven of them (all but the D.C. Jail) located at Lorton, Virginia. With the exception of the minimum security and the modular facility, all are under court-imposed population ceilings, as follows: D.C. Jail—*Campbell v. McGruder,* C.A. No. 1462–71 and C.A. No. 75–1668; maximum security—*John Doe v. District of Columbia,* C.A. No. 79–1726; Lorton central facility—*Twelve John Does v. District of Columbia,* C.A. No. 80–2136; three Occoquan facilities—*Inmates of Occoquan v. Barry,* C.A. No. 82–2128 (this appeal). The maximum security and the Lorton central facility are under population caps entered through consent decrees.

Because the minimum security facility is inappropriate for housing most inmates, its lack of a population cap is largely irrelevant for present purposes. The Lorton modular facility is relatively new, but it is already substantially overused, holding 627 inmates in an institution with a capacity of 400.

**47.** The majority's caveat that it does not "hold today that the use of a population cap as a remedy is per se impermissible" (Maj.Op. at 843 n. 22) provides little comfort in view of the overwhelming thrust of the Opinion which rejects such a remedy for all practical purposes.

quan institution will become the District's correctional institution of both first and last resort, with ever increasing numbers of inmates crammed into the existing space with the existing services.

All this is so although, whatever the problems with a population ceiling, it would still be less intrusive of local correctional administration than injunctions relating to specific conditions, *e.g.*, failure to provide adequate medical care, adequate supervision to prevent or minimize inmate-upon-inmate assaults, repair of screens and mattresses, maintenance of sanitary conditions, and the like. Such detailed injunctions would require constant judicial inspection, interference, and possible contempt citations, to ensure that the sometimes necessarily complex court orders were actually being complied with. A population ceiling, by contrast, can normally be a one-time remedy,[48] requiring relatively little, if any, further interference by the courts with the internal operations of the institution.

Finally, on the issue of a population cap as a remedy versus injunctive relief relating to specific problems, it is noteworthy that the district court itself was conscious of the desirability of removing the population ceiling it had ordered when that could safely be done. On that basis, the court ordered the submission of reports regarding substantive conditions at the institution, and it stated that it would entertain motions to modify the square footage formula when progress was being made.

I believe that, for the reasons discussed above, the district court's order imposing the population ceiling should be sustained. Pursuant to the procedure it has already initiated, the court could then be expected to eliminate or modify the ceiling if and when concrete and genuine improvements are made, particularly in the areas of overcrowding, health, and safety. Not only would this method of proceeding be appropriately mindful of the district court's equitable discretion, but it would be far more likely to be successful than reliance on

promises of improvements on a voluntary basis, without an existing court order.

For these reasons, I respectfully dissent.

---

48. Even where, as here, the correctional authorities are recalcitrant and repeated enforcement proceedings have proved to be necessary, they

are still less complex and less intrusive than the enforcement of highly specific orders relating to discrete conditions.